Renee YOUNG, Plaintiff,

v.

OFFICE OF THE UNITED STATES
SENATE SERGEANT AT
ARMS, Defendant.

No. CIV.A. 98–0794(PLF).

United States District Court,
District of Columbia.

Aug. 22, 2003.

David Bohan Lamb, John Perazich, Washington, DC, Kevin I. Goldberg, Kevin J. Fin-

negan, Goldberg & Finnegan, Silver Spring, MD, for plaintiff.

Diana L. Embrey, Paul, Hastings, Janofsky & Walker, L.L.P., Russell Hayes Gore, Seyfarth Shaw, Jean M. Manning, Micheal J. Yoch, Brenda Pence, Washington, DC, for defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case is before the Court on defendant's motion to dismiss as a sanction for plaintiff's abuse of the litigation process, specifically her willful and repeated failure to comply with discovery obligations and her efforts to tamper with and/or bribe witnesses. Defendant asks the Court to dismiss this lawsuit pursuant to Rules 16(f), 37(b) and 41(b) of the Federal Rules of Civil Procedure and pursuant to the inherent power of the Court to preserve the integrity of the judicial system. Upon consideration of the entire record in this case, particularly the testimony offered at the evidentiary hearing on October 25, 2000, the Court finds that there is clear and convincing evidence of misconduct by the plaintiff and that any sanction short of dismissal would be inadequate. For these reasons, the Court grants defendant's motion to dismiss.

## I. BACKGROUND

Plaintiff Renee Young was employed as a bindery specialist at the Office of the Senate Sergeant at Arms ("SAA") from October 1979 until her termination on December 19, 1997. Plaintiff alleges that she was subjected to a hostile work environment at the SAA, which caused her to suffer a nervous breakdown and post-traumatic stress disorder. See Third Amended Complaint ¶¶ 24, 25 ("Am. Compl."). More specifically, Ms. Young alleges that starting in 1989 and continuing through 1996, two of her supervisors subjected her to numerous unsolicited and unwelcome sexual actions. See id. at ¶¶ 10, 11. Ms. Young also alleges that several co-workers participated in the sexual harass-

ment by subjecting her to sexual jokes and spreading rumors that Ms. Young and another one of her supervisors were involved in a sexual relationship. See id. at ¶ 13. Ms. Young claims that she complained on several occasions to management personnel, but that no disciplinary action was ever taken. See id. at ¶ 12.

Ms. Young took leave from her job in August 1997 to address a medical disability, namely, post-traumatic stress disorder, a condition that plaintiff alleges was caused by the hostile work environment to which she was subjected. See Am. Compl. ¶¶ 24, 25. Before her termination on December 19, 1997, Ms. Young participated in three counseling and mediation sessions through the Office of Compliance, a step required by the Congressional Accountability Act, 2 U.S.C. §§ 1301 et seq. ("CAA"), before congressional employees can file an employment discrimination suit against Congress. See Am. Compl. at ¶¶ 6, 7, 8, 27; 2 U.S.C. § 1402(a). Ms. Young filed this action on March 27, 1998, three months after her termination.

In her Third Amended Complaint, plaintiff alleges that: (1) defendant created a hostile work environment, which included repeated sexual harassment of plaintiff; (2) she was terminated without due process;[1] (3) defendant retaliated against plaintiff for making sexual harassment complaints; (4) defendant engaged in disability discrimination; (5) defendant violated the Family Medical Leave Act; and (6) defendant retaliated against plaintiff by misrepresenting the facts concerning Ms. Young's termination, which caused Ms. Young's unemployment benefits to be delayed and then denied. See Am. Compl. ¶¶ 34, 40, 42, 48, 51, 57. Ms. Young has been proceeding pro se since her lawyers withdrew from the case in October 1999.

Defendant has moved to dismiss plaintiff's case in its entirety as a sanction for plaintiff's bad faith abuse of the litigation process. Specifically, defendant alleges that plaintiff willfully refused to comply with discovery obligations and participated in two incidents of witness tampering. In light of this severe

---

1. This claim is similar to the due process claim previously dismissed by this Court. See Memorandum Opinion of September 17, 1998 at 4–6.

misconduct, defendant argues, plaintiff's case should be dismissed. The Court concludes that the severity of plaintiff's misconduct and the inadequacy of lesser sanctions justify dismissal of this case in its entirety.

## II. DISCUSSION

### A. The Court's Power to Sanction

#### 1. Sanctions Under the Federal Rules of Civil Procedure

A court may impose a range of sanctions based on several of the Federal Rules of Civil Procedure, including in some instances dismissal. First, Rule 37(b)(2) permits a court to issue such orders "as are just" to sanction a party who fails to obey an order to provide or permit discovery, including a discovery order under Rule 26, governing discovery generally, and Rule 35, governing orders for independent physical or mental examinations. *See* Fed.R.Civ.P. 37(b)(1). Such sanctions may include taking certain facts as established, prohibiting the introduction of certain evidence, striking pleadings or parts thereof, staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof and/or rendering a judgment by default against the disobedient party. *See* Fed.R.Civ.P. 37(b)(2); *Bonds v. District of Columbia,* 93 F.3d 801, 807–08 (D.C.Cir. 1996); *Shepherd v. American Broadcasting Cos.,* 62 F.3d 1469, 1474 (D.C.Cir.1995).[2] In addition, Rule 16 of the Federal Rules authorizes a court to sanction a party for failure to follow a scheduling or pretrial order, by imposing any of the sanctions authorized by Rule 37(b) as appropriate. *See* Fed. R.Civ.P. 16(f). Finally, Rule 41 authorizes a court to dismiss a case for failure to prosecute or to comply with the Federal Rules or any order of the court. *See* Fed.R.Civ.P. 41(b).

#### 2. The Court's Inherent Power

When the Federal Rules do not provide courts with sufficient authority to protect the integrity of the judicial system

and prevent abuses of the judicial process, courts have the inherent power to impose sanctions for abusive litigation practices undertaken in bad faith. *See Shepherd v. American Broadcasting Cos.,* 62 F.3d at 1472. "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). Because its inherent judicial power "must be exercised with restraint and discretion," *Chambers v. NASCO, Inc.,* 501 U.S. at 44, 111 S.Ct. 2123, a district court may use such power to enter a sanction as severe as dismissal or default judgment only if it finds, first, that there is clear and convincing evidence that the fraudulent or bad faith misconduct occurred, and second, that a lesser sanction "would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits." *Shepherd v. American Broadcasting Cos.,* 62 F.3d at 1472 (default judgment reversed because district court had made neither of these findings). Furthermore, a "district court must not only find the misconduct by clear and convincing evidence, but must also provide a specific, reasoned explanation for rejecting lesser sanctions." *Id.* at 1480.

Our court of appeals has provided further guidance on the limits of the sanction of dismissal or default judgment by articulating three possible (although not mandatory) justifications for dismissal as a sanction for misconduct, regardless of whether the court bases its decision on the Federal Rules or its inherent power. *See Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C.Cir.1998). Under *Webb,* such sanctions are justified when: (1) the other party has been "so prejudiced by the misconduct that it would be unfair to require [the party] to proceed further in the case," (2) the party's misconduct has put "an intolerable burden" on the court by requiring the court to modify its own

---

2. The possible sanctions set out in Rule 37(b)(2) are not mutually exclusive; the court may impose several of the specified sanctions at the same time. *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2289.

docket and operations in order to accommodate the delay, *or* (3) the court finds it necessary "to sanction conduct that is disrespectful to the court and to deter similar misconduct in the future." *Id.* at 971; *see also Butera v. District of Columbia,* 235 F.3d 637, 661 (D.C.Cir.2001). In this case, the Court finds that plaintiff willfully failed to comply with two separate court orders requiring production of her medical records, failed to cooperate with the independent medical exam, and abused the litigation process by tampering with two witnesses. Where a party's "entire course of conduct throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court," the conduct is sanctionable under the inherent power of the court. *Chambers v. NASCO,* 501 U.S. at 50–51, 111 S.Ct. 2123. Because the Court concludes that no sanction short of dismissal would suffice to properly sanction plaintiff's misconduct, the Court will grant defendant's motion to dismiss.

### B. *Plaintiff's Misconduct Justifying Sanction*

#### 1. Discovery Abuses

■ Defendant asserts that plaintiff has abused the litigation process by repeatedly refusing to comply with discovery requests despite two court orders mandating compliance. As a result, defendant argues, plaintiff has delayed the progress of her own case, interfered with the SAA's ability to defend itself, wasted judicial resources and demonstrated disrespect for the judicial process. *See* Defendant's Motion to Dismiss ("Def.'s Mot.") at 8. Based on the evidence presented by the parties, and particularly the testimony heard in court at the evidentiary hearing, the Court concludes that plaintiff has committed numerous abuses of the discovery process that justify the sanction of dismissal.

Plaintiff's noncompliance with discovery obligations began with her failure to produce any of her medical records in response to defendant's discovery requests. *See* Defendant's Reply Memorandum, Exhibit 2, Affidavit of Diana Embrey ¶¶ 35, 36 ("Embrey Aff."). Weeks after Ms. Young's discovery responses were due and only a week before her scheduled deposition, she had produced a total of only six pages of medical records, none of which contained information from any of the many doctors whom she had consulted before and after the alleged harassment. *See id.* at ¶ 53. Even after the Court issued two orders requiring plaintiff to produce such records, plaintiff produced only incomplete records. *See* Orders of August 4 and August 6, 1999; Embrey Aff. ¶¶ 63–70. In fact, in an August 6, 1999 session with one of her doctors—only two days after the Court ordered plaintiff to produce her medical records—Ms. Young specifically asked the psychiatrist *not* to send any of her medical records to her lawyers. *See* Def.'s Mot., Exhibit A, Progress Note dated August 6, 1999. At the October 25, 2000 hearing on defendant's motion to dismiss, plaintiff did not deny that she had asked her doctor to withhold her records in defiance of the Court's order. When asked whether it was true that "at one point you did ask Dr. Campbell not to send your records," plaintiff replied: "I'm not going to say yes to that.... [b]ecause I don't recognize—I don't, you know, remember saying that." Plaintiff also testified in response that she later "went back and told him to send the papers[.]" Transcript of October 25, 2000 Motions Hearing ("Tr.") at 97–98.

Ms. Young also refused to submit to an independent medical examination pursuant to Rule 35 of the Federal Rules of Civil Procedure, despite repeated requests that she meet with the SAA's psychiatrist, Dr. Glenn Miller. Similar to her response to requests for her medical records, Ms. Young did not comply with this discovery request until the SAA threatened to seek further court intervention. *See* Def.'s Mot., Exhibit B, Letter from Diane Embrey to Kevin Finnegan, August 20, 1999 at 2 ("Embrey Letter, Aug. 20, 1999"). Even when she finally agreed to meet with Dr. Miller, Ms. Young arrived 30 minutes late for the appointment, insisted that her cousin remain in the room during the interview and refused to schedule another appointment. *See* Tr. at 57–58, 68 (Testimony of Dr. Glenn Miller); Embrey Aff. ¶¶ 25, 29; Def.'s Mot., Exhibit C, Letter from Diane Embrey to Kevin Finnegan, September 7, 1999 at 1 ("Embrey Letter, Sept. 7,

1999"). Once again, defense counsel threatened to contact the Court to compel plaintiff's attendance; once again, Ms. Young relented. *See* Embrey Letter, Sept. 7, 1999 at 2.

During the second interview with Dr. Miller, Ms. Young was "much more hostile and much more resistant" than in the first session and refused to answer basic questions. *See* Tr. at 69–70, 74 (Testimony of Dr. Miller). Plaintiff told Dr. Miller "flat-out that she didn't want to talk about her mother" and would not discuss her father or her children. *See id.* at 72. Ms. Young also indicated that she felt she had complied with the requirement of meeting with Dr. Miller simply by showing up. Dr. Miller recalled plaintiff's statement at the second interview: "I did it, I came here, I did it." *Id.* at 73. At that interview, plaintiff also told Dr. Miller that "she was not under oath here. . . . She was here and she could answer questions if she wanted to or [not] if she didn't want to." *Id.* Ultimately, Dr. Miller concluded that Ms. Young's resistance was so intense that he "wasn't going to get any information" from her, so he requested that she leave early. *Id.* at 74–75.

In her own testimony at the October 25, 2000 hearing, plaintiff characterized her sessions with Dr. Miller differently:

> I did answer some of his questions. He stated that I gave him a hard time. That's not true. I also questioned him. And the reason for questioning him was because I was trying to figure out what this man really was, was he really a psychiatrist. . . . And I did not just sit in a chair. We were talking back and forth. And because I questioned him, he got upset and said, "Leave, now." So I got up.

Tr. at 106–08. Plaintiff also testified that she "responded the way I did" to Dr. Miller because she was uncomfortable at his office because of its location in the basement of his house, causing her to insist that her cousin stay in the room for the first interview. *See id.* at 106–07.

Based on the evidence before the Court and the testimony of both Dr. Miller and Ms. Young, the Court finds that there is clear and convincing evidence that Ms. Young abused the discovery process by initially refusing to meet with Dr. Miller and later refusing to answer the basic questions necessary for Dr. Miller to evaluate her mental state in connection with her claims in this action. *See* Tr. at 76 (Testimony of Dr. Miller); *Shepherd v. American Broadcasting Cos.,* 62 F.3d at 1472. As a direct result of her refusal to submit to examination by Dr. Miller, plaintiff has delayed her own case and significantly prejudiced the SAA by frustrating its efforts at discovery and preventing it from obtaining an independent medical examination necessary to defend itself against plaintiff's claims of emotional harm. *See* Embrey Aff. ¶¶ 4–29; Def.'s Motion at 8–9; Tr. at 76 (Testimony of Dr. Miller). In addition, plaintiff has directly violated two court orders requiring her to comply with discovery requests by her failure to provide relevant medical records and directing her psychiatrist not to provide the records. Such conduct precluded defendant from preparing for and taking plaintiff's deposition, required the unnecessary expenditure of judicial resources and threatened the integrity of the judicial process. *See* Embrey Aff. ¶¶ 30–70; Def.'s Mot. at 8–9. Based on this clear and convincing evidence of plaintiff's abuse of the discovery process, the Court finds that the sanction of dismissal is warranted on this ground. *See Shepherd v. American Broadcasting Cos.,* 62 F.3d at 1472.

### 2. Witness Tampering

In addition to her abuses of the discovery process, defendant alleges that plaintiff attempted to tamper with two potential witnesses in the case. Defendant alleges that plaintiff had contact with Ray Lucas, an SAA employee with whom plaintiff worked for several years, and attempted to bribe him to testify falsely in support of her claims against the SAA. In addition, defendant asserts that plaintiff tried to influence the testimony of another witness, James Davis, a former friend and co-worker of plaintiff. Because the Court finds by clear and convincing evidence that plaintiff engaged in such conduct and that her misconduct in tampering with the witnesses and seeking false testimony from both was severe, the Court con-

cludes that the sanction of dismissal is appropriate on this ground as well.

### a. Ray Lucas

Defendant has offered evidence that while Ms. Young and her brother, Herbert Dozier, Jr., were talking on the telephone sometime in August, 1999, plaintiff's brother made a third-party call to Mr. Lucas, enabling all three to talk with each other on the same call. *See* Tr. at 13–15; Def.'s Mot., Exhibit D, Affidavit of Ray Lucas ("Lucas Aff."). During this conversation, the evidence shows, Mr. Dozier offered Mr. Lucas $50,000 if Mr. Lucas would testify on behalf of Ms. Young at trial and falsely implicate several SAA employees, despite the fact that Mr. Lucas never actually witnessed anyone act inappropriately toward Ms. Young. *See* Tr. at 15–21. Mr. Dozier testified as follows:

COUNSEL: ... [Y]ou asked [Ray Lucas] what it would take to get him to help Renee [Young] in her case.

DOZIER: Yes, I did.

COUNSEL: You asked him what it would take to get him to come to your side of the table.

DOZIER: Yes, I did.

COUNSEL: You told him that if he testified for Renee, you'd make it worth his while, didn't you?

DOZIER: More or less speaking, I did, yeah.

COUNSEL: In fact, you told him that if Renee won some money from this case, that you'd make it worth his while, didn't you?

DOZIER: Yes, ma'am.

COUNSEL: You told him you'd make sure he was compensated, didn't you?

DOZIER: Yes, I did.

COUNSEL: In fact, you offered him $50,000 if he would testify in her case, didn't you?

DOZIER: If he told the truth and it was helpful. If she recovered some monies, I would.

\*　　\*　　\*　　\*　　\*　　\*

COUNSEL: And when you offered Ray Lucas $50,000 to testify in this case, Renee was on the phone.

DOZIER: Yes, she was.

COUNSEL: She never objected when you offered the money, did she?

DOZIER: She didn't say anything.

COUNSEL: She didn't say a word when you offered him $50,000?

DOZIER: No, ma'am. No. She didn't know I was even going to say it?

COUNSEL: After you offered Ray Lucas money, he started singing like a bird, didn't he?

DOZIER: He didn't actually sing like a bird. I didn't get the information I wanted to get from Ray. He didn't disclose whether he knew things first-hand or if he was a third party involver or anything. I don't know if he got a chance to see—if he was a witness or if he heard she-say, he-say situation or something. And I didn't want he-say, she-say. I was interested to know if he got a chance to be right there as a witness himself and he could testify, I saw this, I saw that. He never disclosed that to me, if he was or not.

COUNSEL: He never said he actually saw anything happen to her.

DOZIER: No. He didn't.

Tr. at 16–18.[3]

Although it was Mr. Dozier, not plaintiff herself, who offered the $50,000 to Ray Lucas during the three-way telephone conversation, Mr. Dozier's testimony was unambiguous that he made a clear attempt to bribe a witness in this case, plaintiff heard the offer made on her behalf, and she did not object.[4]

---

3. Mr. Lucas, in his affidavit, said that plaintiff asked him to testify that three employees had approached her in a sexual way, but that he told her that he had not seen any of them do anything to her over the course of many years and that he could not say the things she was asking him to say. *See* Lucas Aff. at ¶¶ 10–18.

4. Mr. Lucas also testified at the evidentiary hearing concerning the telephone conversation. Although his recollection was not entirely clear, he eventually recalled that the subject of money was brought up by Mr. Dozier and that in response, Ms. Young became angry that Mr. Dozier was telling her how to spend her money. *See* Tr. at 136–37. This testimony does not diminish Ms.

In addition, Mr. Dozier testified that later that same day he and plaintiff discussed how they might pay Ray Lucas "under the table" without any of the lawyers knowing. *See* Tr. at 22. His testimony revealed his and plaintiff's understanding that their conduct was improper:

> COUNSEL: And the reason you talked about paying Ray Lucas under the table is because you knew that offering a witness money is illegal, didn't you?
>
> DOZIER: It was like a donation.
>
> COUNSEL: You knew it was illegal, didn't you?
>
> DOZIER: Yeah, I did.

Tr. at 22–23.

Moreover, in her own testimony at the hearing, plaintiff did not dispute Mr. Dozier's account of the telephone conversation. *See* Tr. at 108–18. In response to the Court's direct inquiry as to whether she wanted to say anything about her brother's earlier testimony, Ms. Young as much as admitted her complicity in the bribe: "The only thing I can state that my brother has stated—that wasn't stated, let's put it like that, that he was on Workmen's Comp. . . . And Ray assumed that I was the one that was giving him money, where my brother was getting money hisself [sic] that was going to pay him." Tr. at 108. Based on the testimony of Mr. Dozier, Mr. Lucas and Ms. Young herself, the Court must conclude that plaintiff was a full participant in an illegal attempt to bribe a witness in this case in exchange for false testimony.

#### b. James Davis

Defendant further alleges that Ms. Young tried to influence the testimony of another witness, James Davis, a former friend and co-worker of plaintiff. With respect to this allegation as well, the Court must agree that plaintiff improperly tampered with a witness—and this time, more directly.

Once again, the words of the participants are most telling. In his testimony at the evidentiary hearing, James Davis recounted a conversation in which Ms. Young called him on the telephone and asked him "to go and tell the Senate lawyers different things that were happening at the Senate." Tr. at 36. Mr. Davis described specific allegations of sexual harassment that Ms. Young told him to report to the Senate lawyers, including detailed statements by various individuals at the SAA. See *id.* at 36–40. As Mr. Davis testified, plaintiff telephoned him and asked him to tell the lawyers that "Claudia . . . had grabbed my [Mr. Davis'] peter," that Vic . . . came up behind me and humped me," that Tim . . . "humped Doris at her machine while she was working one day," and that other sexual incidents occurred in the workplace. Tr. at 36–39. Because he "didn't want a confrontation," Mr. Davis agreed to tell the lawyers everything that plaintiff told him to say, despite having no personal knowledge that any of the incidents plaintiff described had ever occurred. *See id.* at 36, 38, 41–44. *See also* Def.'s Mot., Exhibit E, Affidavit of Jim Davis at ¶¶ 5–10.[5] Ms. Young did not deny asking Mr. Davis to report these things to the Senate. Rather, in her motion for non-dismissal, Ms. Young states only that Mr. Davis "changed his story" while testifying at the hearing. *See* Pl.'s Mot. at ¶ 2.

On the basis of the credible testimony of James Davis, the Court finds, by clear and convincing evidence, that Ms. Young attempted to "coach" Mr. Davis into providing false testimony on her behalf in order to corroborate her allegations of sexual harassment. This attempt to influence a witness to fabricate testimony, coupled with Ms. Young's complicity in the attempted bribe of another witness, warrants the most serious sanction of dismissal.

#### C. Inadequacy of Lesser Sanctions

▆ Even with clear and convincing evidence of plaintiff's misconduct, the Court may not dismiss a case without providing a reasoned explanation of why lesser sanctions would not sufficiently punish and deter the

---

Young's accountability for the bribe but instead confirms her awareness of it and her failure to object to the offer as improper.

5. Ultimately Mr. Davis did talk to the lawyers, but testified in Court that he did not lie to them but merely said that plaintiff had asked him to tell the lawyers that certain incidents had happened. *See* Tr. at 42–43.

abusive conduct while allowing a full and fair trial on the merits. *See Shepherd v. American Broadcasting Cos.*, 62 F.3d at 1472, 1480.

### 1. Monetary Sanctions

 Monetary sanctions include fines and the award of attorneys' fees and expenses. In light of plaintiff's inability and/or unwillingness to pay the costs of prosecuting this lawsuit (as shown by her counsel's withdrawal, *see* Tr. at 99), monetary sanctions would be ineffectual since it is unlikely that Ms. Young could pay any fines or other monetary sanctions. *See also* Transcript of September 14, 1999 Motions Hearing at 4–5 ("reimbursement has been requested [for counsels' costs and expense of $1,900] and the client does not recognize an obligation to pay those litigation costs … We told her it would be at least four or five [thousand dollars in costs for discovery] and she told us she would not even be able to pay that amount."). *See Derzack v. County of Allegheny*, 173 F.R.D. 400, 416 (W.D.Pa.1996), *aff'd* 118 F.3d 1575 (3rd Cir.1997) ("Plaintiff's inability or unwillingness to pay a monetary sanction clearly renders it ineffectual."). In addition, where there has been fraudulent misconduct, "monetary sanctions may be inherently inadequate to remedy the harm to the public interest in preserving the integrity of the courts and in deterring future misconduct." *Id.* at 417. Furthermore, the imposition of monetary sanctions alone would suggest that money could cure litigation misconduct even of the magnitude found here, including witness tampering and suborning perjury. To impose only a money sanction would be "an open invitation to abuse of the judicial process" and would convey a message to Ms. Young and other litigants "that they have everything to gain and nothing to lose" by engaging in such conduct. *Pope v. Federal Express Corp.*, 138 F.R.D. 675, 683 (W.D.Mo.1990), *aff'd in relevant part*, 974 F.2d 982 (8th Cir.1992).

### 2. Protective Orders

 In light of plaintiff's repeated disregard of her discovery obligations and this Court's orders regarding discovery, as well as her conduct in her meetings with Dr. Miller and her cavalier attitude in testifying at the evidentiary hearing, the Court finds it extremely unlikely that plaintiff would obey a protective order prohibiting her from any further contacts with SAA employees. Moreover, even if a protective order prohibiting Ms. Young from contacting SAA employees might prevent future harm, it does not punish her for the misconduct in which she already has engaged. Since substantial harm already has resulted from plaintiff's misconduct, both to defendant's ability to defend itself and to the institutional integrity of the judicial process, the Court concludes that a protective order is an inadequate remedy in this case.

### 3. Issue-related Sanctions

 Issue-related sanctions may include adverse evidentiary rulings and preclusion of specific claims, defenses or evidence, and taking certain facts as established. Thus, for example, the Court in this case could bar plaintiff from introducing any evidence on her emotional disability claims because of her failure to provide medical records and cooperate in the independent medical examination. Such issue-related sanctions are not appropriate, however, where, as here, the misconduct goes to a dispositive issue, such that an issue-related sanction "effectively disposes of the merits anyway." *See Webb v. District of Columbia*, 146 F.3d at 972. Furthermore, "dismissal is the appropriate sanction where a party manufactures evidence which purports to corroborate its substantive claims." *Vargas v. Peltz*, 901 F.Supp. 1572, 1580–81 (S.D.Fla.1995)(court dismissed sexual harassment suit as sanction for plaintiff's fabrication of evidence to support her harassment claims.) Dismissal is particularly appropriate where a plaintiff seeks to enhance the merits of her case with fabricated evidence and fictionalized testimony. *See id.* at 1581.

Ms. Young attempted to create false testimony on the dispositive facts underlying her lawsuit—that is, whether or not she was sexually harassed. Issue-related sanctions like preclusion of evidence or taking certain

facts as established therefore would effectively dispose of the merits of her claims, all of which hinge directly or indirectly on the alleged sexual harassment. More specifically, Ms. Young's disability discrimination claim stems from the emotional disability she purportedly suffered as a result of the alleged sexual harassment. *See* Am. Compl. at ¶ 24. If Ms. Young were barred from presenting evidence on her emotional disability, that would render her disability discrimination claim and her Family and Medical Leave Act claim without any evidentiary support. Similarly, if Ms. Young were barred from presenting evidence on her sexual harassment allegations, then her hostile work environment and retaliation claims necessarily would fail as well. Such issue-related sanctions would strip Ms. Young's case of any basis and would result in a further waste of court resources and time if the case were permitted to proceed. The Court therefore concludes that such a sanction is not only inappropriate in view of the egregiousness of plaintiff's conduct, but would also "effectively dispose[ ] of the merits any way." *Webb v. District of Columbia*, 146 F.3d at 972.

### 4. Civil Contempt

 Ordinarily civil contempt is used to compel compliance with an order of the court, although in some circumstances it may be used "to compensate the complainant for losses sustained through a fine payable to the complainant." *United States v. Waksberg*, 112 F.3d 1225, 1226 (D.C.Cir.1997) (quoting *United States v. U.S. Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)); *see Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). In this case, however, civil contempt would be as ineffective a sanction for plaintiff's misconduct as would a monetary sanction. Ms. Young has abused the litigation process so substantially that she has lost the privilege of maintaining this lawsuit. Coercing or seeking to obtain or manufacture false testimony "strikes at the heart of the judicial system. Lying cannot be condoned in any formal proceeding.... Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts." *Quela v. Payco–General Am. Credits, Inc.*, 82 Fair Empl. Prac. Cas. (BNA) 1878, 2000 WL 799750 (N.D.Ill.2000), *available at* No. 99 C 1904, 2000 WL 799750, 2000 U.S. Dist. LEXIS 6932, *20. Plaintiff has sought to undermine that purpose. A contempt citation under these circumstances would not preserve the integrity of the judicial process. The alternative, to initiate a criminal contempt proceeding, would neither address the many ways in which Ms. Young has frustrated the ability of the defendant to defend itself nor at this late date set the case back on track for trial or disposition.

### III. CONCLUSION

Clear and convincing evidence has been presented that plaintiff willfully obstructed the discovery process and violated this Court's discovery orders and therefore is subject to sanctions pursuant to the Federal Rules of Civil Procedure. In addition, clear and convincing evidence has been presented that plaintiff attempted to influence the testimony of two witnesses in bad faith. She therefore is subject to the ultimate sanction, dismissal, pursuant to the Court's inherent power. Because defendant has been so prejudiced by plaintiff's misconduct that it would be unfair to require defendant to proceed further, and because plaintiff's misconduct has so jeopardized the integrity of the judicial process itself, any sanction short of dismissal would be inadequate to deal with plaintiff's misconduct. The Court therefore grants defendant's motion to dismiss. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

### ORDER

For the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that defendant's motion to dismiss as a sanction for plaintiff's abuse of the litigation process is GRANTED; it is

FURTHER ORDERED that this case is DISMISSED and shall be removed from the docket of this Court; and it is

FURTHER ORDERED that this Order shall constitute a Final Judgment in this

case. This is a final appealable order. *See* Fed. R.App. P. 4(a).

SO ORDERED.