**In re Betty DALCO.**

**No. 09–05–467 CV.**

Court of Appeals of Texas, Beaumont.

Submitted Dec. 1, 2005.

Decided March 2, 2006.

Kimberly Soard, Law Offices of Kimberly Soard PC, Katy, for relator.

Jennifer J. Spencer, Fulbright & Jaworski L.L.P., Dallas, for real party in interest.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

PER CURIAM.

Relator, Betty Dalco ("Dalco"), seeks mandamus relief from the trial court's order disqualifying her trial counsel, Kimberly Soard, and Soard's law firm, for breach of confidentiality and conflict of interest. The order was the result of a motion to disqualify filed by the plaintiff/real party in interest in the underlying lawsuit, Citibank (South Dakota) N.A. ("Citibank"). Each party contests the factual representations of the other.

The factual background of the underlying suit indicates that Citibank extended a line of credit to Dalco and issued her a credit card. Citibank alleged that Dalco defaulted in making payments on charges made to the line of credit thereby violating certain terms contained in a "Card Agreement." Citibank proceeded to accelerate maturity of the total amount due on the account, an amount alleged to be $14,710.27. The manner of notice to Dalco of her default allegedly included what Dalco described as harassing telephone calls to her home from a collection agency (Re-gent & Associates) employed by Citibank. Ultimately, Citibank filed suit against Dalco for breach of contract to recover the amount that Dalco was alleged to owe, and for quantum meruit.

Dalco hired Kimberly Soard to defend her in the underlying suit. Soard has been in private practice since February 2005. Prior to that time, Soard was "Executive Vice President/General Counsel" for Universal Fidelity Corporation ("Universal"), a nation-wide company engaged in commercial and consumer debt-collection. She was employed by Universal for over six years. According to her resume, filed by Citibank as an attachment to its motion to disqualify, Soard directly supervised the legal department at Universal, and indirectly supervised other staff. She was responsible for negotiating and drafting client agreements, employment agreements, commercial contracts, and other corporate contracts. Soard's duties at Universal also included the following:

I provided the legal defense and/or settlement for federal and/or state violation claims or complaints against the company, or I oversaw the legal outsourcing of these claims—I personally defended most lawsuits which are instituted against our company in all states and jurisdictions where allowed[.] I was responsible for the determining the legality of all corporate practices and policies[.] I oversaw the establishment and continuation of all necessary state permits and licensing[.] Also, I provided legal counsel for the corporate officers, managers, and departmental staff members. I also am involved in all legislative affairs and issues that affect our industry and state laws which affected our company. (sic et passim)

Soard's resume also indicates that while employed with Universal, she made presentations annually at Universal corporate

offices on topics concerning the federal Fair Debt Collection Practices Act and the Texas Debt Collection Practices Act. Additionally, while a law student, Soard did legal research on debt collection practices for the general counsel at two separate companies. We find nothing in the record indicating Citibank contested Soard's knowledge and experience in both federal and state debt collection law and debt collection practices.

At the heart of Citibank's disqualification motion is the contention that in her capacity as General Counsel and Executive Vice President of Universal, Soard "personally signed" a series of commercial employment contracts between Universal and Citicorp Credit Services, Inc. ("CCSI"), a "corporate affiliate" of Citibank, and not a party to this lawsuit. By the terms of these contracts, CCSI, itself a debt-collection entity and a subsidiary of Citigroup, Inc., employed Universal "for purposes of collecting debts owed to Affiliate Clients[.]" Entitled, "Collection Agency Agreement," each contract contained a list of definitions, followed by nine "articles" detailing the various duties and responsibilities of the parties under the contract. The copies of the contract appearing in the record were signed for the years 2002, 2004, and 2005, with Soard signing as corporate representative for Universal.

Each of the contracts appear to be identical, with "Article 7" setting out the confidentiality provisions in eight paragraphs. We reproduce the more pertinent portions of Article 7 as follows:

7.1 In performing this Agreement, [Universal] will have access to information that is confidential and proprietary to CCSI. Such information may include, without limitation: names, addresses, demographic/behavioral/credit information relating to customers of affiliated clients; marketing strategies, targeting methods, and other CCSI business objectives. [Universal] shall use such information only for the purpose of providing the services required by this Agreement and shall not accumulate in any way or make use of such information for any other purpose. [Universal] shall ensure that only its employees who need to know such information to perform the services required by this Agreement will receive it, and that such employees shall agree to be bound by the provisions of this Article....

7.2 The obligations imposed on [Universal] shall not apply to information that [Universal]: already knew; received from a third party who had the right to disclose it; was authorized by CCSI to disclose; developed independently; obtained from the public domain; or was required to disclose by a court of (sic) governmental agency with appropriate jurisdiction.

. . . .

7.5 Citigroup subsidiaries and affiliates have made a formal promise to their customers regarding the use of certain financial information. A copy of that formal Privacy Promise is attached as **Exhibit C.** [Universal] agrees to not do anything that would cause CCSI to violate the terms of the Privacy Promise. Notwithstanding any other provision of this Agreement authorizing CCSI to audit [Universal's] performance of this Agreement, CCSI shall have the independent right to audit [Universal's] compliance with the requirements of this section of the Agreement.

7.6 Both parties agree to abide by and comply with all state and federal laws regulating privacy of information related to customers of affiliated clients. And the parties agree to conform their conduct to comply with such laws regard-

less of any term or requirement otherwise set out in this Agreement.

Article 9 of the contracts contained certain "general" provisions, with paragraph 9.1 including the following language:

9.1 [Universal] and CCSI understand, acknowledge and agree that CCSI is not selling any accounts, or any underlying debt concerning the referred accounts, to [Universal] by virtue of this Agreement. Instead, CCSI is retaining [Universal] as an independent contractor, as that term is defined by applicable state and federal law including the Internal Revenue Code, for the exclusive purpose of collecting delinquent account balances on accounts owned by affiliate clients. Subject to the terms of this Agreement and Exhibit A, [Universal] understands and agrees it has the right to determine the method and manner of achieving the result for which it is being retained. Nothing in this Agreement shall be deemed to permit CCSI to manage ... [Universal's] business affairs.

Citibank filed with the trial court, as well as with us, a large number of documents for *in camera* inspection in support of its disqualification motion. Citibank designated all of its *in camera* material "highly-confidential and proprietary." However, a number of documents included in this material are public records as they are copies of papers and deposition testimony from a suit filed in Yoakum County, Texas, in which Soard represented Universal in her capacity as corporate counsel. Other than indicating Soard was actively involved as corporate counsel for Universal, something which Dalco does not contest, Citibank fails to inform us what further relevance the Yoakum County litigation documents have *vis-a-vis* the disqualification of Soard as Dalco's counsel.

Apart from the series of CCSI/Universal employment contracts discussed above, the remainder of the *in camera* material appears to be proprietary-type documents. These proprietary-type documents appear under Tabs 9 and 10 within the *in camera* material. We have attempted to match-up these documents with Citibank's arguments contained in their motion to disqualify, as well as with the argument presented to the trial court and the argument contained in its response to Dalco's petition for writ of mandamus. The essence of Citibank's position before the trial court, and before this Court, is that Soard used Citibank's (and CCSI's) confidential information to Citibank's detriment in the Dalco litigation, therefore "disqualification was required in light of the law protecting Citibank's confidences." Citibank relies heavily on *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex.1996). Such reliance on *Godbey* is misplaced as its facts are readily distinguishable from those in the instant case.

Citibank's response to Dalco's petition can be summed up by the following argument:

Any attorney—whether or not she represented a particular third party—is duty-bound to preserve the confidences of that third party where she obtains those confidences under a confidentiality agreement. *See, e.g., National Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 129 (Tex.1996). In such circumstances, there is an *irrebuttable presumption* that "an attorney's knowledge of a non-client's confidential information that he has promised to preserve is imputed to other attorneys in the same law firm." *Id.* at 132. Thus, not only is the subject attorney disqualified, but so is her current law firm. *Id.* [at] 131–32.

(Emphasis in original). While *Godbey* does indeed stand for the propositions not-

ed above, Citibank has extracted these holdings from a complicated set of facts quite dissimilar to those in the instant case. In *Godbey,* the attorney in question, Tomko, was initially retained by National Medical Enterprises, Inc. ("NME") to provide legal counsel for two of NME's corporate executives who were targets of a criminal investigation into NME's activities as well as parties in related civil lawsuits. *Godbey,* 924 S.W.2d at 124–25. At some point during Tomko's representation of the NME executives, Tomko joined the Baker & Botts law firm. *Id.* at 124. Tomko represented both executives for about one year, but did not represent either executive in any lawsuit. *Id.* at 124–25. It was undisputed that during his representation of the NME executives, Tomko received confidential information not only from the two individuals but also from NME as well during conferences and meetings during which a joint defense was discussed. *Id.* at 125. These discussions with various individuals and NME were undertaken pursuant to a "written joint defense agreement," signed by Tomko as retained counsel for the two NME executives. *Id.* Pertinent portions of the "joint defense agreement" are set out in the *Godbey* opinion, and contain the following language:

1. Unless expressly stated in writing to the contrary, any communications between or among any of the client members and/or the attorney members concerning the [*investigations and litigation involving NME* ] are confidential and are protected from disclosure to any third party by the joint defense privilege, the attorney-client privilege and the work product doctrine.

. . . .

3. None of the information obtained by any client member or attorney member pursuant to this agreement shall be disclosed to any third party without the consent of the attorney member who disclosed the information in the first instance.

*Id.* (emphasis added).

Subsequently, Tomko and Baker & Botts withdrew from representing the NME executives. *Id.* Seventeen months later, Baker & Botts attorneys not involved in representing the NME executives filed suit against NME on behalf of former patients of NME. *Id.* The allegations in the new civil litigation were substantially related to the prior criminal investigations and civil lawsuits involving NME and one of Tomko's former executive clients. *Id.* at 125, 129. NME moved to disqualify Baker & Botts from representing the plaintiffs on the ground that Tomko possessed confidential information from NME and to which all Baker & Botts attorneys must be presumed to have had access. *Id.* at 126. One of Tomko's former executive clients intervened and filed his own motion to disqualify Baker & Botts. *Id.* Among other reasons for denying both motions, the trial court found that (1) it could not be presumed that Tomko shared NME's confidences with other Baker & Botts attorneys because neither Tomko nor Baker & Botts represented NME, (2) that Baker & Botts was not disqualified unless it owed NME a duty of loyalty because of its representation of the two NME executives or the joint defense agreement, or (3) that Baker & Botts was actually misusing NME's confidences. *Id.* at 126.

The Court initially pointed out that Baker & Botts' disqualification hinged on whether Tomko would be disqualified had he been counsel for the plaintiffs. *Id.* at 128–29. Ultimately finding abuse of discretion by the trial court in failing to disqualify Baker & Botts as plaintiffs' counsel, the Court first noted that the pending

lawsuit was "identical in all material respects" to the prior investigations and lawsuits that focused on NME and Tomko's former executive clients. *Id.* at 129. "Had Tomko represented NME in the same matters in which he represented [the NME executives], both he and Baker & Botts would be disqualified from representing plaintiffs in the pending action against NME. *See NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398, 399–400 (Tex.1989)." *Id.* However, Tomko never represented NME, only the two NME executives. As noted in *In re Meador,* 968 S.W.2d 346, 350 (Tex.1998), the fact that NME was never a client of Tomko was undisputed. "Thus, neither [Disciplinary] Rule 1.05 (protecting confidential information of a *former client*) nor [Disciplinary] Rule 1.09 (prohibiting an attorney from representing a party in a matter adverse to a *former client* if the matter is substantially related to the former representation) applied." *Id.* at 350–51 (emphasis in original). In the instant case, it is also undisputed that neither Citibank nor CCSI were ever *former clients* of Soard, in either her capacity as corporate counsel for Universal or in her private practice.

The *Godbey* Court found Tomko's "duty" to the non-client/co-defendants, which included NME, within the terms of the joint defense agreement that he signed as retained counsel for the two executive/co-defendants. *Godbey,* 924 S.W.2d at 129. As the Court reasoned:

> Tomko, like the other attorneys and clients participating in the joint defense, agreed to undertake "a duty to preserve the confidences disclosed." This did not preclude an attorney and client from acting in their own best interests, even to the point of using information disclosed by others in ways that conflicted with the others' interests. For example, the parties recognized that situations could arise in which it would become

necessary for them to cross-examine each other in court. But Tomko and the other parties strictly promised not to disclose information shared in the joint defense with third parties under any circumstances. Thus, Tomko agreed that any communications from other participants in the joint defense were "confidential and ... protected from disclosures to any third party by the joint defense privilege, the attorney-client privilege and the work product privilege."

*Id.* (citation omitted).

■ In the instant case, Citibank equates the commercial employment contract between CCSI and Universal to the "joint defense agreement" discussed in *Godbey.* Such a comparison is also misplaced. At the heart of entering into a "joint defense agreement" with other named or potential co-defendants and their counsel is to collectively preserve the "joint defense privilege," found in TEX.R. EVID. 503(b)(1)(C). When applicable, the joint defense "privilege" "cloaks communications with confidentiality where 'a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" *See United States v. Gotti,* 771 F.Supp. 535, 545 (E.D.N.Y.1991) (quoting *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989)).

A careful reading of *Godbey* in light of subsequent pronouncements by the Court leads to the conclusion that its holding was fashioned with very fine brushstrokes. Like the disciplinary rules found applicable only to a "client" or "former client" in *Meador,* 968 S.W.2d at 350–51, Rule 503(b)(1)(C) appears to attach the common interest "privilege" to confidential communications disclosed in the course of legal services rendered during some

"*pending action*" and "*concerning a matter of common interest therein.*" Tex.R. Evid. 503(b)(1)(C) (emphasis added). Here, pursuant to its commercial employment contract with Universal, CCSI provided Universal with certain confidential or proprietary information from a variety of sources, one source being Citibank. However, this contractual relinquishment of Citibank's confidential or proprietary information to Universal did not occur during any "pending action" and therefore could not concern "a matter of common interest therein." *Id.* More importantly, neither CCSI nor Citibank was ever a "client" or "former client" of Soard. The facts are undisputed that Soard was corporate counsel for Universal exclusively and Citibank presented no evidence that either it or CCSI were ever a co-defendant with Universal in which shared confidences were exchanged in furtherance of a joint defense. Ultimately, we find *Godbey*'s applicability to be narrowly confined to the somewhat unique set of facts and circumstances arising in that case, but not to the starkly contrasting factual situation before us.[1]

 "Mandamus is an extraordinary remedy, available only when a trial court clearly abuses its discretion and when there is no adequate remedy on appeal." *In re Kuntz*, 124 S.W.3d 179–80 (Tex.2003) (citing *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992)). A trial court's determination of factual issues "[are] entitled to deference in a mandamus proceeding and should not be set aside unless it is clear from the record that only one decision could have been reached." *GTE Comm'ns*

Sys. Corp. v. Tanner, 856 S.W.2d 725, 729 (Tex.1993) (citing *Walker*, 827 S.W.2d at 839–40). "In contrast, a trial court has no discretion in determining what the law is or applying the law to the facts." *Kuntz*, 124 S.W.3d at 181. Consequently, the trial court's erroneous legal conclusion, even in an unsettled area of law, constitutes an abuse of discretion. *Huie v. DeShazo*, 922 S.W.2d 920, 927–28 (Tex.1996) (citing *Lunsford v. Morris*, 746 S.W.2d 471 (Tex. 1988)). A party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's erroneous ruling. *Kuntz*, 124 S.W.3d at 181 (citing *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 942–43 (Tex.1998)). We have previously found that a party generally lacks an adequate appellate remedy in disqualification cases. *See Skiles*, 102 S.W.3d at 326 (citing *Godbey*, 924 S.W.2d at 133).

 It has been repeatedly recognized that disqualification of counsel is a severe remedy. *See In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005); *In re Sanders*, 153 S.W.3d 54, 57 (Tex.2004); *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex.2002); *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex.1990); *Coker*, 765 S.W.2d at 400. Disqualification can result in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice. *Nitla S.A. de C.V.*, 92 S.W.3d at 422. Therefore, "'[m]ere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice' to merit disqualification."

---

**1.** *Skiles* was another somewhat unusual factual scenario involving the sharing of confidential information between attorneys "made for the purpose of facilitating the rendering of professional legal services, when such communications are made by the client's lawyer to a lawyer representing another party in a pending action and concerning a matter of common interest." *Skiles*, 102 S.W.3d at 326–27. Again, in the instant matter, we have nothing even approaching such facts and circumstances. Thus, the holding in *Skiles* is equally inapplicable to the instant case as is the holding in *Godbey*.

*Sanders,* 153 S.W.3d at 57 (quoting *Spears,* 797 S.W.2d at 656). While courts often look to the disciplinary rules to decide disqualification issues, the rules· are "merely guidelines—not controlling standards—for disqualification motions." *Nitla S.A. de C.V.,* 92 S.W.3d at 422 (citing *Meador,* 968 S.W.2d at 350). Even if an attorney violates a disciplinary rule, the party moving for disqualification must demonstrate that the violating attorney's conduct caused actual prejudice that requires disqualification. *Id.; see In re Users Sys. Servs.,* 22 S.W.3d ·331, 336 (Tex.1999); *Meador,* 968 S.W.2d at 350; *Ayres v. Canales,* 790 S.W.2d 554, 558 (Tex.1990). But, under appropriate facts and circumstances, a trial court may disqualify an attorney even in the absence of any disciplinary rule violation. *See Meador,* 968 S.W.2d at 351. Nevertheless, because disqualification is such a severe remedy, the burden is on the movant to establish with specificity any alleged violation of one or more disciplinary rules. *Spears,* 797 S.W.2d at 656 (citing *Coker,* 765 S.W.2d at 400). We reiterate that mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice under this standard. *Id.* (citing *Coker,* 765 S.W.2d at 400). .

In the instant case, other than a large number of filings, very little movement in the litigation had taken place prior to the disqualification of Dalco's· counsel. In response to Citibank's suit, Dalco's counsel filed an amended answer and "Cross Claim & Request For Emergency Injunction Hearing." In it, Dalco agrees she opened a credit card account with Citibank, but contests the fact that she entered into any negotiated agreement regarding the terms and conditions controlling the account.

She also denies that she defaulted in making payments on the account and denies owing any payments on the account. This pleading further includes a portion titled, "Cross Claim Against Plaintiff & Cross Defendant Regent & Associates LLP."[2] Dalco's suit against Citibank and Regent & Associates, L.L.P. ("Regent") alleges violations of both the federal ·and the Texas debt collection practices acts with regard to harassing telephone contacts to Dalco, and requests injunctive relief and actual and punitive damages.

Dalco later filed a motion for summary judgment based upon TEX. FIN.CODE ANN. § 392.306 (Vernon 1998), which provides: "A creditor may not use an independent debt collector if the creditor has actual knowledge that the independent debt collector repeatedly or continuously engages in acts or practices that are prohibited by this chapter." Dalco's summary judgment facts rely on her experiences with Regent's personnel as well as on the experiences of other litigants represented by Dalco's counsel in unrelated litigation against both Citibank and Regent also involving alleged harassing telephone contacts. Attached to the summary judgment motion are copies of affidavits from Dalco, and from two other individuals, all relating similar harassment-type telephone debt-collection contacts purportedly from Regent personnel acting on behalf of Citibank. Prior to filing her summary judgment motion, Dalco made various discovery requests, all contained in one motion. This motion included a request for admissions, a request for "disclosure," a request for interrogatories, and a request for production.

We have examined all of the various pleadings, motions, and requests filed by Dalco and can see nothing that appears to involve or implicate any of the confidential

---

**2.** These appear to be counterclaims against Citibank and ·a third-party action against Re-gent & Associates rather than cross-claims. *See* TEX.R. CIV. P. 38, 97.

or proprietary information included with the *in camera* material submitted to the trial court in support of the disqualification motion. We have no opinion and make no comment as to the merits of either party's allegations in the underlying lawsuit. And, as in the usual course of any litigation, either party's discovery requests will be subject to the standard discovery objections and conditions. We simply find no support in any of Dalco's pleadings or other court papers for Citibank's disqualification motion.

Following its disqualification of Soard, the trial court filed findings of fact and conclusions of law. The pertinent findings of fact are not supported by substantive evidence but are mere conclusory statements. The pertinent conclusions of law are inapplicable to the specific facts and circumstances present in the record before us. For example, the first eleven findings of fact pertain to uncontested background facts regarding the commercial employment agreement between CCSI and Universal. There is little mention of Soard in these first eleven findings except to establish that she personally signed several of the agreements "on behalf of Universal." Finding number twelve, however, reads as follows: "Soard's central legal role as General Counsel of Universal necessarily placed her at the center of the action where she became privy to clients' confidential information—information she agreed and represented she would protect and use only in furtherance of collection efforts." First, instead of setting out specific facts clearly established in the record, this finding begins by assuming that Soard's position as Universal's general counsel gave her actual knowledge of Citibank's confidential or proprietary information because such a position "necessarily placed her at the center of *the action* where she became privy" to such information. (Emphasis added).

We are somewhat troubled by the word "necessarily" and very troubled by what, or where, "the action" was. It is also unclear how the word "clients'" is meant to be understood. As previously noted, the record indicates Soard was never legal counsel to CCSI or Citibank, nor was Soard ever involved with either entity in a joint-defense, *Godbey*-type of enterprise. Being unsupported by the record before us, finding twelve is without probative value and will be disregarded. *See In re American Home Prods. Corp.*, 985 S.W.2d 68, 74 (Tex.1998).

The next findings of fact pertinent to the disqualification of Soard are numbers sixteen through nineteen. They read as follows:

16. Soard is, *inter alia*, (1) soliciting clients based on her prior experience working on CCSI's and Citibank's behalf and (2) is targeting (or taking advantage of) the confidential and specific policies, practices and procedures which Soard learned solely because of her prior commitment and contrary to her independent legal duties to keep such information confidential.

17. Soard was admitted into Citibank's confidences with her pledge to preserve them.

18. Soard simply cannot honor her obligations under the Agreement, Texas Disciplinary Rules of Professional Conduct, and Texas Rules of Evidence, and, at the same time, defend the present case or prosecute the Defendant's counterclaims against Citibank.

19. Soard's representation of Defendant in the present case gives a strong and irremediable appearance of impropriety.

We read finding sixteen as a determination that the portion of Soard's private law practice which focuses on debt relief and

other remedial measures for debtors was undertaken "solely" because of Soard's knowledge of Citibank's and/or CCSI's confidential or proprietary information. But, as we have previously noted, Soard's resume, attached to Citibank's disqualification motion, indicates extensive knowledge of debt collection practices, and of both the Texas and federal fair debt collection practices acts. Citibank did not specifically point out to the trial court, nor to us, what particularized knowledge or information that was *confidential or proprietary as to Citibank* Soard was attempting to make use of in the instant case. Again, the facts of this case are unlike those in *Godbey* or *Meador* or any of the other reported cases in that the instant case does not involve 1) a client, or a former client, or a former co-defendant consulted or assisted in prior litigation, or 2) a joint defense agreement or joint defense enterprise, either personally signed by Soard in her personal capacity as retained counsel for a co-defendant, or strongly implied from consultation with other counsel representing a co-defendant for joint defense purposes in some pending action. Findings seventeen through nineteen are also unsupported by the evidence and are also based on the continued misplaced interpretation of the holdings in *Godbey* and the other reported disqualification cases as noted previously. The trial court's conclusions of law suffer from similar infirmity. Most of the conclusions of law rely heavily on *Godbey* or attempt to neatly fit the instant facts to certain observations or holdings in *Godbey*, but fail to provide the complete factual, legal, and

procedural context present in *Godbey*. Certain other "conclusions of law" are actually further factual findings not supported by the record.[3]

▇▇▇▇ We conclude our analysis of the issue before us by reiterating a point that is uniformly noted in most of the cases involving disqualification of trial counsel, that being the severity of the remedy requested. On the record before us, all that has been factually established is that Dalco's trial counsel, Kimberly Soard, possesses a generalized knowledge of consumer protection/debt collection law sufficient to prosecute and defend a client alleged to have failed to make payments on her credit card account. In our examination of the various pleadings and other court papers filed by Soard, we find no probative evidence that anything other than her basic educational and employment experiences, wholly separate from and unrelated to any of the *in camera* material provided by Citibank, along with the possible assistance of a number of legal treatises, practice guides, and form books, are the sources of her defense of Dalco and of Dalco's claims against Citibank and Regent. *See generally* 27 STEPHEN COCHRAN, TEXAS PRACTICE: CONSUMER RIGHTS AND REMEDIES (2002 & Supp.2004); 28A STEPHEN G. COCHRAN, TEXAS PRACTICE SERIES: TEXAS CONSUMER LAW HANDBOOK (2005); 16 WILLIAM V. DORSANEO III ET AL., TEXAS LITIGATION GUIDE, chap. 242 (2005). *See also, Bingham v. Collection Bureau, Inc.,* 505 F.Supp. 864 (D.N.D.1981). Because the trial court applied an improper

---

**3.** For example, "conclusion" ten makes the conclusory statement that Soard's representation of Dalco is "substantially related" to Soard's "access" to Citibank's confidential or proprietary information. Except for other such conclusory statements in the various affidavits submitted by Citibank in support of its disqualification motion, the record contains no probative evidence to support such a find-

ing. "Conclusion" eleven positively borders on the clairvoyant in finding Soard possessed a "mental blue print" of Citibank's confidential or proprietary information which, "in all reasonable probability" would be continually used against Citibank in the instant case. How the trial court managed to divine this "mental blue print" is not apparent from the record we possess.

standard of law to the motion to disqualify, and found facts that were unsupported by probative evidence, its disqualification of Kimberly Soard as Dalco's counsel was an abuse of discretion. Disqualification of counsel renders remedy by appeal inadequate. *See Skiles,* 102 S.W.3d at 326. We conditionally grant mandamus relief and will issue the writ only if the trial court does not vacate the order of disqualification.

WRIT CONDITIONALLY GRANTED.