# IN THE SUPREME COURT OF TEXAS

No. 97-0582

In re Dana Meador, Relator

On Petition for Writ of Mandamus

Argued December 4, 1997

Chief Justice Phillips delivered the opinion for a unanimous Court.

The issue in this original mandamus proceeding is whether the trial court abused its discretion by refusing to disqualify plaintiff's counsel. Defendants contend that the lawyer improperly used privileged documents which the lawyer's client (in another lawsuit) secretly removed from defendants' offices. We hold that, under the facts and circumstances of this case, the trial court did not abuse its discretion by refusing to disqualify the lawyer. The court of appeals therefore abused its discretion in granting mandamus relief compelling disqualification. *See* 948 S.W.2d 345. Accordingly, we conditionally grant mandamus relief against the court of appeals.

I

Patricia Peterson worked at Conley, Lott, Nichols Machinery Company (CLN) from May 1994 until January 1996 as executive assistant for Robert Nichols, CLN's president. She had access to Nichols's office, and among her responsibilities were opening his mail and retrieving his phone

messages.

During Peterson's tenure, Dana Meador, a former financial consultant for CLN, sued the company and Nichols for fraud, breach of contract, intentional infliction of emotional distress, assault, and discrimination. Meador alleged, among other things, that Tom Dowdle, CLN's former general manager, had sexually harassed her. When Meador filed her suit, CLN was prosecuting its own suit against Dowdle for fraud, which CLN subsequently settled in June 1995. Peterson, in the course of her duties at CLN, came across and read a letter from CLN's attorneys to Nichols describing the settlement terms. The letter reflected that, in addition to a cash payment, Dowdle had agreed to give CLN a sworn statement concerning the *Meador* lawsuit. The letter, however, did not specify, or set requirements for, the content of Dowdle's statement.

Dowdle subsequently gave his sworn statement, which Peterson also found and read at CLN. Peterson, who claims that she was also sexually assaulted by Dowdle, testified that the statement (which is not in the record) contained "blatant lies." Without Nichols's permission, Peterson copied the settlement letter, as well as a follow-up letter transmitting the settlement funds, a chronology of events in the *Meador* dispute prepared by CLN's counsel, and Nichols's handwritten notes about the *Meador* lawsuit. Peterson did not, however, copy Dowdle's statement. She testified that she expected CLN to pressure her for false testimony in the *Meador* lawsuit, and that she wanted the documents to help her substantiate the truth. Peterson admitted during testimony that Nichols would not have allowed her to copy the documents had he known of it. Peterson, believing she was about to be fired, quit her job at CLN in January 1996, taking the covertly copied documents with her.

Five months later, in considering whether to bring her own claim against CLN, Peterson called

Meador. Meador referred Peterson to her own attorney, W. D. Masterson. At their first meeting in June 1996, Masterson agreed to represent Peterson. During this meeting, Peterson gave Masterson the Dowdle settlement letter she had copied in CLN's offices. Either Masterson or Peterson also gave a copy of the settlement letter to Meador.

A few days later, CLN deposed Meador in the underlying action. Although Meador's full deposition is not in the record before us, Meador testified at the disqualification hearing that, during her deposition, she gave the Dowdle settlement letter to CLN's attorneys and told them that Peterson had copied other documents as well. It is not clear whether Meador voluntarily produced the settlement letter or did so in response to a subpoena duces tecum.

Four months later, CLN noticed Peterson's deposition, including a subpoena duces tecum for all documents which Peterson may have taken from CLN. In response to the subpoena, Peterson gave the other documents to Masterson, who copied them. She then produced the documents at her deposition a week later. Upon seeing the documents, CLN demanded that Masterson return all copies of them, claiming that they were privileged. When Masterson refused to do so, CLN moved to disqualify him from representing Meador. After an evidentiary hearing in December 1996, the trial court ordered Masterson to return all of the CLN documents removed by Peterson, and to not use them in the *Meador* litigation. The court, however, refused to disqualify Masterson.

CLN then petitioned for writ of mandamus to the trial court. The court of appeals granted the relief, adopting the standard of conduct from ABA Formal Opinion 94-382, promulgated by the

American Bar Association's Committee on Ethics and Professional Responsibility.[1] That opinion provides:

> A lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon recognizing the privileged or confidential nature of the materials, either refrain from reviewing such materials or review them only to the extent required to determine how appropriately to proceed; she should notify her adversary's lawyer that she has such materials and should either follow instructions of the adversary's lawyer with respect to the disposition of the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.

ABA FORMAL OP. 94-382. The court of appeals focused on the Dowdle settlement letter, concluding that, even though this letter is privileged on its face, Masterson made no effort to notify CLN that he had the document. Because "Masterson's conduct fell short of the standard that an attorney who receives unsolicited confidential information must follow," the court of appeals ordered his disqualification. 948 S.W.2d at 349.

Masterson then sought mandamus relief in this Court against the court of appeals. We stayed the trial court proceedings and granted leave to file.

---

[1] This ten-person standing committee of the American Bar Association is charged with "interpreting the professional standards of the Association and recommending appropriate amendments and clarifications. . . ." ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT viii (ABA Center for Professional Responsibility, 3d ed. 1996). It issues advisory opinions on ethics questions of general interest submitted by attorneys. *See id.*; *see also* Klein, *Legal Malpractice, Professional Discipline, and Representation of the Indigent Defendant*, 61 TEMP. L. REV. 1171, 1179 n.54 (1988). While the Committee's opinions are often cited as persuasive authority by state disciplinary bodies, the opinions do not bind those bodies. *See, e.g.*, ABA INFORMAL OP. 1420 (1978) ("Enforcement of legal ethics and disciplinary procedures are local matters securely within the jurisdictional prerogative of each state and the District of Columbia."); Hellman, *When "Ethics Rules" Don't Mean What They Say: The Implications of Strained ABA Ethics Opinions*, 10 GEO. J. LEGAL ETHICS 317, 326 (1997) ("ABA opinions are binding upon no one. ABA opinions represent the views of a small committee of a private association, and they construe that private association's Model Rules and Model Code. The power to determine whether and to what extent either of these model documents will be put into force in any state is exercised by a state authority, most commonly the state's highest court." (notes omitted)).

II

In determining whether the court of appeals abused its discretion by granting mandamus relief, we maintain our focus on the trial court's ruling. *See Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985). Although the trial court refused to disqualify Masterson, it ruled that he must return all copies of the documents and that he could not use them in the *Meador* litigation. Meador has not challenged this portion of the trial court's ruling. The only issue before us, therefore, is whether the trial court abused its discretion in refusing to disqualify Masterson.

Meador first argues that the trial court could not properly disqualify Masterson because he did not violate a specific disciplinary rule. She contends that ABA Formal Opinion 94-382, on which the court of appeals relied, is merely advisory, and does not impose a binding disciplinary standard on Texas attorneys. This contention is correct. The Texas Disciplinary Rules of Professional Conduct and opinions from Texas courts and the State Bar of Texas interpreting those rules provide the disciplinary standards for Texas attorneys. *See generally* TEX. GOV'T CODE §§ 81.072, 81.092. Meador further correctly argues that no specific Texas disciplinary rule applies to the circumstances of this case. Because Masterson did not violate a specific Texas disciplinary rule, Meador reasons, he cannot be disqualified. To answer this argument, we must consider the relationship between our disciplinary rules and attorney disqualification.

We have often looked to our disciplinary rules to decide disqualification issues. *See National Medical Enters. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996); *Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 422 (Tex. 1996); *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656-57 (Tex. 1990); *Ayres v. Canales*, 790 S.W.2d 554, 555-58 (Tex. 1990); *NCNB Texas Nat'l Bank v.*

5

*Coker*, 765 S.W.2d 398, 399 (Tex. 1989). We have emphasized, however, that the disciplinary rules are merely guidelines--not necessarily controlling standards--for such motions. *See Godbey*, 924 S.W.2d at 132; *Anderson Producing*, 929 S.W.2d at 422; *Spears*, 797 S.W.2d at 656. Indeed, the preamble to the Disciplinary Rules recognizes that "these rules are not designed to be standards for procedural decisions." TEX. DISC. R. PROF. COND., Preamble ¶ 15. Particularly, a court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification. *See, e.g.*, TEX. DISC. R. PROF. COND. 3.08. cmt. 10.

Meador argues, however, that while an attorney's violation of the disciplinary rules may not always justify disqualification, a court cannot disqualify an attorney unless he or she has violated a rule. For support, she points to our language in *Spears*:

> The courts must adhere to an exacting standard when considering motions to disqualify so as to discourage their use as a dilatory tactic. Thus, the burden is on the movant to establish with specificity a violation of one or more of the disciplinary rules. Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice under this standard.

*Spears*, 797 S.W.2d at 656. The issue in *Spears*, however, was whether a lawyer had violated two specific disciplinary rules. The quoted language thus cannot be read as a holding that a court can never disqualify an attorney absent a disciplinary violation. For example, in *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996), we held that the trial court abused its discretion in denying defendant NME's motion to disqualify the plaintiffs' attorney, even though the motion was not based on a specific disciplinary rule. The attorney had formerly represented a co-defendant of NME in substantially related litigation, and had been privy to NME's confidential information under a joint-defense agreement. Although the attorney had agreed to protect the

confidentiality of this information, it was undisputed that he had never represented NME. Thus, neither Rule 1.05 (protecting confidential information of a *former client)* nor Rule 1.09 (prohibiting an attorney from representing a party in a matter adverse to a *former client* if the matter is substantially related to the former representation) applied. *See* TEX. DISC. R. PROF. COND. 1.05, 1.09. We nonetheless recognized that the attorney had a duty under the joint-defense agreement to protect the co-defendant's confidences. We thus compelled the attorney's disqualification, relying on federal precedents and an ABA ethics opinion. *See Godbey*, 924 S.W.2d at 129-131.

Based on our repeated statements that the disciplinary rules are only guidelines for disqualification motions, and the holding of *Godbey*, it is clear that a court has the power, under appropriate circumstances, to disqualify an attorney even though he or she has not violated a specific disciplinary rule. We therefore must determine whether, under the particular facts of this case, the trial court abused its discretion in refusing to disqualify Masterson.

III

Without doubt, there are situations where a lawyer who has been privy to privileged information improperly obtained from the other side must be disqualified, even though the lawyer was not involved in obtaining the information. Discovery privileges are an integral part of our adversary system. By protecting attorney-client communications and an attorney's work product, they encourage parties to fully develop cases for trial, increasing the chances of an informed and correct resolution. *See generally National Tank Co. v. Brotherton*, 851 S.W.2d 193, 200-03 (Tex. 1993). As the United States Supreme Court has recognized:

7

> Were [an attorney's work product] open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 511 (1947). *See also General Motors Corp. v. Gayle*, 951 S.W.2d 469, 474 (Tex. 1997) (explaining similar rationale underlying the consulting-expert privilege).

Thus, a lawyer who uses privileged information improperly obtained from an opponent potentially subverts the litigation process. While we do not exercise our rulemaking authority via judicial opinion, *see State Dep't of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992), we nonetheless agree with the court of appeals that ABA Formal Opinion 94-382 represents the standard to which attorneys should aspire in dealing with an opponent's privileged information. The ABA's approach reflects the importance of the discovery privileges, and ensures that the harm resulting from an unauthorized disclosure of privileged information will be held to a minimum.

Even if Formal Opinion 94-382 were our disciplinary standard, however, it would still only be a guideline for disqualification. Indeed, we believe it is impossible to articulate a bright-line standard for disqualification where a lawyer, through no wrongdoing of his or her own, receives an opponent's privileged materials. For example, situations may exist where the attorney does everything within his or her power to mitigate the harm from the disclosure, yet the privileged information is so sensitive that disqualification is necessary to ensure a fair trial. On the other hand, there may be situations where the disclosure may cause some prejudice to movant's claim, yet other factors, such as the movant's fault contributing to the disclosure or the harm to the nonmovant from disqualification

of his or her attorney, may justify denial of the motion to disqualify. In sum, the trial court, giving due consideration to the importance of our discovery privileges, must consider all the facts and circumstances to determine whether the interests of justice require disqualification. In this exercise of judicial discretion, a trial court should consider, among others, these factors:

1) whether the attorney knew or should have known that the material was privileged;

2) the promptness with which the attorney notifies the opposing side that he or she has received its privileged information;

3) the extent to which the attorney reviews and digests the privileged information;

4) the significance of the privileged information; i.e., the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice;

5) the extent to which movant may be at fault for the unauthorized disclosure;

6) the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney.

We emphasize that these factors apply only when a lawyer receives an opponent's privileged materials outside the normal course of discovery. If a lawyer receives privileged materials because the opponent inadvertently produced them in discovery, the lawyer ordinarily has no duty to notify the opponent or voluntarily return the materials. Rather, the producing party bears the burden of recovering the documents by establishing that the production was involuntary. *See Granada Corp. v. First Court of Appeals*, 844 S.W.2d 223, 226 (Tex. 1993). Also, we express no opinion on the proper standard for disqualifying an attorney who was directly involved in wrongfully procuring an opponent's documents.

Some of these factors weigh in favor of Masterson's disqualification. For example, Masterson

9

should have known after the most cursory review that the materials which Peterson gave him were privileged. Despite that, he did not notify CLN upon receiving the documents, although his clients did produce all of them to CLN a short time later at their depositions. Also, it appears that Masterson thoroughly reviewed the materials, as he directly referenced specific portions of the documents in his response to CLN's sanctions motion. Finally, CLN was not at fault for the breach of its privileges, as Peterson covertly copied and removed the documents while working as Nichols's executive assistant.

Other factors, however, support the trial court's ruling. It does not appear that the information in the privileged documents will significantly prejudice CLN's claims and defenses in the *Meador* lawsuit. The settlement letter--the document on which the court of appeals focused in granting mandamus relief--merely states that Dowdle agreed to give a statement regarding the *Meador* litigation; it does not disclose the contents of Dowdle's statement. Peterson did not remove the actual statement from CLN's offices. Although she reviewed the statement and may have related its substance to Masterson, CLN did not submit a copy of the statement to the trial court for in camera inspection. Thus, we cannot determine the extent of any harm to CLN. The remaining documents consist primarily of Nichols's handwritten notes, taken during a mediation session and during meetings with CLN's attorneys. While these notes contain Nichols's detailed observations about the case, including what appear to be potential settlement terms, we have located no specific information--and CLN points to none--which is likely to significantly prejudice CLN's claims or defenses. As noted, the trial court ordered Masterson to return all copies of the documents, which we presume he has done.

Also, Meador testified that she would suffer serious hardship if Masterson is disqualified. Pursuant to their contingent-fee agreement, Masterson is not only prosecuting Meador's claims against CLN but is also defending CLN's counterclaims against her. While these counterclaims are not in our mandamus record, Meador testified that they involve claims in excess of $1 million for professional malpractice arising from her services as financial consultant. Meador further testified that, if Masterson is disqualified, she could not afford to pay a lawyer on an hourly basis to defend the counterclaims. The trial court expressly found that Meador would "undoubtedly" suffer hardship if Masterson were disqualified, in that she would be "deprived of the benefit of [retained] counsel in a complicated case that is otherwise substantially ready for trial." The trial court further concluded that, in these circumstances, disqualification would "confer[ ] an enormous strategic advantage upon Defendants."

Meador argues that we should also consider that Peterson gave Masterson the privileged documents "pursuant to an attorney-client relationship, not simply as a third party witness." This factor, however, is of little significance. Meador appears to contend that, where the documents are received from a client, the attorney's return of them to the opponent might implicate the client in their misappropriation, in violation of the attorney-client privilege. The attorney-client privilege, however, protects "confidential communications" between the lawyer and client. TEX. R. CIV. EVID. 503(b). Meador presents no authority that this privilege would prohibit an attorney from merely returning an opponent's privileged documents. Notably, courts have generally held that the attorney-client privilege does not relieve an attorney from his or her ethical duty to turn over to authorities misappropriated property received from a client. *See* 1 MCCORMICK ON EVIDENCE § 89 (4th ed.

11

1992). Similarly, the privilege should not affect an attorney's obligation to return misappropriated privileged documents. Moreover, Formal Opinion 94-382 recognizes that where return of the documents directly to the opponent might prejudice the legitimate rights of the lawyer's client, the lawyer may simply refrain from using the documents until a court determines their proper disposition.

A trial court abuses its discretion when it acts in an unreasonable or arbitrary manner or, stated differently, when it acts without any reference to guiding rules or principles. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). On this record, we cannot conclude that the trial court abused its discretion in refusing to disqualify Masterson.

IV

CLN also argues that Masterson must be disqualified under our decision in *Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831 (Tex. 1994). There, we held that a law firm must be disqualified from a suit if it hires a paralegal that formerly worked on the suit for opposing counsel, unless the hiring firm effectively screens the paralegal from any contact with the suit. We noted that disqualification is always required "when information relating to the adverse client has in fact been disclosed." *Id.* at 835.

CLN argues that Peterson is akin to a paralegal, as she assisted CLN with the *Meador* litigation in her capacity as Nichols's executive assistant. Although Peterson had no legal training and was not a paralegal, there was evidence that she did help assemble discovery documents for the *Meador* suit. CLN further argues that, in applying *Phoenix Founders* to these facts, in makes no

12

difference that Peterson became a client of Masterson, rather than an employee. This is a distinction without a difference, CLN argues, because Peterson's attorney-client relationship with Masterson gave her ample opportunity to convey the confidences she had learned at CLN. Finally, CLN argues that Peterson actually conveyed those confidences by giving the privileged documents to Masterson.

We first note that, if one fully accepts CLN's argument, a person possessing privileged information regarding his or her former employer could never obtain legal counsel to sue the employer, notwithstanding the validity of the former employee's causes of action. CLN, however, proposes a more limited rule: a lawyer must be disqualified from an existing case if the lawyer accepts a new client who, while working for the opposing party in the existing case, learned confidential information regarding that case. Thus, Peterson could retain a lawyer to represent her against CLN, just not the one prosecuting the case to which the secretly copied documents related.

While this argument has some surface appeal, we do not believe that the bright-line rule of *Phoenix Founders* extends to these facts. Peterson's attorney-client relationship with Masterson is fundamentally different from that of attorney-paralegal. While Peterson was in a position to give Masterson the confidential documents, and in fact did give him the documents, she did not work with him on a daily basis regarding the *Meador* litigation. Under these circumstances, rather than applying the bright-line rule from *Phoenix Founders*, we must focus on the factors set forth in part III above. As previously discussed, those factors do not mandate Masterson's disqualification under the circumstances of this case.

V

CLN relies on *Contico International, Inc. v. Alvarez*, 910 S.W.2d 29 (Tex. App.--El Paso 1995, orig. proceeding), *mand. granted sub nom., Mendoza v. Eighth Court of Appeals*, 917 S.W.2d 787 (Tex. 1996), and a series of federal cases to support its position that Masterson must be disqualified.

In *Contico*, the defendants moved to disqualify plaintiff's counsel, claiming that he stole their litigation notebook. After the trial court denied the motion to disqualify, the court of appeals granted mandamus relief compelling disqualification. The court of appeals held that "it is misconduct for a lawyer to continue a representation when the lawyer has gained confidences of the opposing party through theft, deceit, inadvertent disclosure or other means." 910 S.W.2d at 35. This Court, however, granted mandamus relief against the court of appeals, holding that the trial court did not abuse its discretion. *See Mendoza v. Eighth Court of Appeals*, 917 S.W.2d 787, 790 (Tex. 1996). Because the trial court "reasonably could have concluded that [the notebook possessed by plaintiff's attorney] was not a copy of Contico's investigation notebook and did not contain any of Contico's confidential information," *id.*, the trial court's factual determination could not be disturbed by mandamus. *Id.* We did not directly address the court of appeals' holding quoted above, on which CLN now relies.

A different case is presented where an attorney is directly involved in improperly obtaining the other side's confidential information. However, for the reasons already discussed, we disapprove of the court of appeals' decision in *Contico* to the extent that it holds that an attorney must be disqualified when, through no wrongdoing on the attorney's part, he or she gains possession of an

14

opponent's confidential information, without regard to the significance of the information or the other circumstances surrounding the disclosure.

The federal cases on which CLN relies are also distinguishable. They either involve an attorney who acted improperly to obtain the other side's confidences, *see Rentclub, Inc. v. Transamerica Rental Fin. Corp.*, 811 F. Supp. 651, 654 (M.D. Fla. 1992), or an employee with extensive litigation responsibilities who switched sides in the litigation. *See Hull v. Celanese Corp.*, 513 F.2d 568, 570-71 (2nd Cir. 1975); *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 714-15 (D. Conn. 1991); *Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1039-40 (W.D. Mo. 1984).

\* \* \*

For the foregoing reasons, we hold that the trial court did not abuse its discretion in refusing to disqualify Masterson. We therefore conditionally grant the writ of mandamus against the court of appeals. The writ will issue only if the court of appeals does not vacate its mandamus judgment.

_____
Thomas R. Phillips
Chief Justice

Opinion Delivered:     April 14, 1998

15