**Opinion issued June 23, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-25-00116-CV

———————————

## IN RE LUGENBUHL, WHEATON, PECK, RANKIN, & HUBBARD AND TODD CRAWFORD, Relators

———————————

## Original Proceeding on Petition for Writ of Mandamus

———————————

## O P I N I O N

Relators Todd Crawford and his law firm, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard (the "Lugenbuhl firm"), filed a petition for writ of mandamus challenging the trial court's orders disqualifying relators from the underlying matters and imposing monetary and non-monetary sanctions.[1] Relators also challenge the

---

[1] The underlying case is *In re Hurricane Zeta Litigation*, Cause Number 2022-36264, pending in the 113th District Court of Harris County, Texas, the Honorable Rabeea Sultan Collier presiding.

trial court's order denying severance of the sanctions orders. We conditionally grant the petition as to the trial court's disclosure sanction against certain Lugenbuhl attorneys and we deny the remainder of the petition.

## Background

This mandamus arises from a group of consolidated cases currently pending in the Hurricane Zeta MDL. Lawsuits were filed by employees of real party in interest Transocean Offshore Deepwater Drilling Inc. ("Transocean"), the owner of the *Deepwater Asgard* drilling rig, including real party in interest Kent Bates, alleging that they were injured while working on the rig during Hurricane Zeta. Relators represented Transocean in that litigation.

Bates was an employee of Transocean who worked on Transocean's *Deepwater Asgard* drilling rig and he filed suit in March 2021, alleging Texas state law negligence and Jones Act claims against Transocean. When he filed suit, Bates had been living with his fiancé, Paulisha Harris, and their two children for a number of years. A year later, Harris contacted Transocean anonymously, stating that she had proof that Bates's suit was fraudulent. She was directed to Crawford and eventually met with him at the Lugenbuhl firm's Gulfport, Mississippi office.

Harris told Crawford about her relationship with Bates and that they had broken up in July 2022. During her initial meeting with Crawford in early August 2022, Harris showed Crawford copies of text messages, emails, and some audiotaped

2

and videotaped recordings from Bates.  On August 5, 2022, Harris returned to the Lugenbuhl firm's offices where she signed an affidavit prepared by Crawford to authenticate the documents she had provided.  That same day, Harris sent Crawford a series of screenshots of text messages, a videotaped recording, and images of prescription medications and prescriptions for Bates.  On August 11, 2022, Harris also texted photographs of documents and a photograph of a compact disc containing images from an MRI, which Crawford said his law office could copy.

Later in August 2022, a legal assistant from the Lugenbuhl firm, Amanda Yoran, asked Harris if she had a child support attorney and gave her the name of a family lawyer who subsequently assisted Harris with child support issues involving Bates.  Harris stated in an affidavit that her family lawyer's fee was paid by Transocean.

After having possession of the documents and information Harris provided for almost two months, Transocean produced the information to Bates as part of a larger document production.  Bates subsequently filed a motion to disqualify and for sanctions against relators, asserting that relators had wrongfully obtained Bates's privileged information from Harris.  Transocean responded, arguing that Harris had sought them out "anonymously and unsolicited," that all documents were produced to Bates, and none were privileged, and alternatively, that any privilege had been waived.

The trial court held a hearing on January 17, 2023.  On February 2, 2023, the trial court signed an order granting Bates's motion to disqualify Crawford "from participating in the MDL and all cases in it."  After supplemental briefing and responses, the trial court signed an order on December 18, 2024, containing findings of fact and conclusions of law, including credibility determinations, disqualifying the Lugenbuhl firm and imposing monetary sanctions in the amount of $500,000 "to compensate [Bates] and to deter further misconduct, as well as to punish the Lugenbuhl firm and Transocean in proportion to their wrongdoing."  The trial court ordered Crawford, the Lugenbuhl firm, and Transocean, jointly and severally, to pay the $500,000 sanction within thirty days of the order.  The trial court also imposed non-monetary sanctions, including revocation of the pro hac vice status of the Lugenbuhl firm attorneys that had been admitted to practice in the MDL court, requiring the Lugenbuhl firm attorneys subject to the order "to disclose a copy of the order to any other Texas court in which they submit an application for admission pro hac vice for the next ten years," and ordering referral of the Lugenbuhl firm attorneys working on the case to the appropriate disciplinary authorities in Texas and Louisiana.

Relators filed a motion to sever and for stay of payment of the monetary sanctions for twenty-one days to facilitate supersedeas in the event of severance and to seek mandamus relief if severance was denied.  Real parties in interest opposed

4

the motion to sever and for stay, and the trial court held a hearing on January 8, 2025. On January 13, 2025, the trial court signed an order denying the motion for severance and the motion to stay the deadline for paying the monetary sanctions. On the same date, the trial court signed an order modifying and clarifying the December 18, 2024 order granting the motion to disqualify and for sanctions and clarifying the January 20, 2023 disqualification order, which among other things, vacated the prior payment deadline for the monetary sanctions. This mandamus petition followed.

## Standard of Review

To show entitlement to mandamus relief, relators must show that the trial court abused its discretion and there is no adequate remedy by appeal. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 125–26 (Tex. 2004) (orig. proceeding). To establish that the trial court abused its discretion, relators must show that the trial court reached "a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). As to the resolution of factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court unless relators establish that the trial court could reasonably have reached only one decision. *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 603–04 (Tex. 2025).

**Analysis**

In their two issues, relators assert that the trial court abused its discretion in (1) denying relators' motion to sever the sanctions proceedings from the merits of Bates's Jones Act claims, and (2) granting real parties in interest's motion to disqualify relators and imposing sanctions. Bates responds that this Court should deny relators' mandamus petition because (1) sanctions are not severable, (2) denying severance did not cause prejudice or manifest injustice, (3) mandamus is not available to challenge factual findings, (4) the sanctions are not unjust or excessive, and (5) proof supported the trial court's ruling.

**A.     Denial of Severance**

Relators filed in the trial court motions to sever and to stay the December 8, 2024 order granting Bates's motion to disqualify and for sanctions. The decision whether to sever claims is one within a trial court's sound discretion. *See Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996). "[A] trial court properly exercises its discretion in severing claims when: (1) the controversy involves more than one cause of action; (2) the severed claim is one that could be asserted independently in a separate lawsuit; and (3) the severed actions are not so interwoven with the other claims that they involve the same facts and issues." *State v. Morello*, 547 S.W.3d 881, 889 (Tex. 2018); *see also Akin*, 927 S.W.2d at 629. We will not disturb a trial court's decision to grant or deny a motion for severance,

6

however, unless the court abused its discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990).

Texas Rule of Civil Procedure 41 states that "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. Courts have held that rule 41 requires proof that more than one cause of action is involved and that the severed claim could be asserted independently in a separate lawsuit. *See Morello*, 547 S.W.3d at 889. Relators assert they have established more than one cause of action because there was a motion for sanctions and a claim for negligence against Transocean. Relators also assert that the claim for sanctions could be the subject of a separate lawsuit, citing *Pate v. Haven at Thorpe Lane, LLC*, 681 S.W.3d 476 (Tex. App.—Austin 2023, pet. granted), but after relators filed their petition for writ of mandamus, *Pate* was reversed by the Texas Supreme Court. *See Ferchichi v. Whataburger Rest. LLC*, 713 S.W.3d 330 (Tex. 2025). Other authority cited by relators merely reflects that in those cases the trial courts granted severance.[2]

Bates responds that sanctions are not severable under rule 41 because they are not "claims." In support of his argument, Bates cites *Kinetic Content, LLC v. Dang*, 695 S.W.3d 769 (Tex. App.—Houston [1st Dist.] 2024, pet. denied), in which this

---

[2] Relators cite to several cases in which the trial court had granted severance, but the appellate court did not address whether that ruling was appropriate. *See, e.g., Pletta v. ORO AII Com., LLC*, No. 01-19-00966-CV, 2021 WL 5773882, at *6–7 (Tex. App.—Houston [1st Dist.] Dec. 7, 2021, pet. denied) (mem. op.).

Court addressed whether a motion for sanctions constituted a "legal action" under the Texas Citizens Participation Act (the "TCPA"). The TCPA permits the filing of a motion to dismiss a "legal action" that is "based on or is in response to a party's exercise of the right to petition, among other enumerated rights." TEX. CIV. PRAC. & REM. CODE § 27.003(a). The TCPA defines a "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim, or any other judicial pleading or filing that requests legal, declaratory, or equitable relief." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6). This definition specifically excludes a "motion made in an action that does not amend or add a claim for legal, equitable or declaratory relief." *Id.* § 27.001(6)(a). Thus, this Court had to determine whether a motion for sanctions was the type of motion specifically excluded from the definition of a "legal action." *See Kinetic*, 695 S.W.3d at 774–75.

In doing so, this Court first considered the trial court's authority to sanction attorneys and parties and observed that various rules and statutes imbue a trial court with that authority, including Texas Rule of Civil Procedure 13 and a trial court's inherent authority. *Id.* at 775. Relying on *Thuesen v. Scott*, 667 S.W.3d 467 (Tex. App.—Beaumont 2023, no pet.), we concluded that because a court can sanction on its own initiative without a motion and under its inherent authority, the right to sanction is not one belonging to a party but instead belongs to the court. *See Kinetic*, 695 S.W.3d at 775–76. And therefore, a party "seeking sanctions under Rule 13

8

[was] not asserting an existing right, i.e., a claim or seeking legal, declaratory, or equitable relief" and thus, it was specifically excluded from the definition of a "legal action" and the TCPA did not apply. *See id.* at 776–77. The Texas Supreme Court recently reached the same conclusion in *Ferchichi*, holding that motions for sanctions are not a "legal action" for purposes of the TCPA because they "are not remotely 'like' a 'lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim," but are instead "based on conduct ancillary to the substantive claims in the case." *Ferchichi*, 713 S.W.3d at 339.

Although *Kinetic* and *Ferchichi* involve construction of the TCPA, Bates asserts that the motion for sanctions in this case, even if this case is not one brought under the TCPA, is not a claim for relief, and it does not fit within the requirements of claims appropriate for severance. Relators disagree, arguing that the TCPA cases are inapplicable because they concern the TCPA's definition of "claim," which the statute defines as a "lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal, declaratory, or equitable relief." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(6).

But because we held in *Kinetic* that the right to sanction under a court's inherent authority is a right belonging to the trial court and not to a party, the reasoning in the *Kinetic* case is authority supporting the trial court's implied finding that the motion to disqualify and sanction in the underlying case was not a claim

9

appropriate for severance. *See* 695 S.W.3d at 776 (agreeing with *Thuesen* reasoning that party seeking sanctions is not asserting legal, declaratory or equitable claim for relief). The motion for sanctions was not one that would be the proper subject of a lawsuit if independently asserted because, as the Texas Supreme Court stated in *Ferchichi*, a motion for sanctions is "based on conduct ancillary to the substantive claims in the case." *Ferchichi*, 713 S.W.3d at 339. At least one other court in a non-TCPA case has also held that sanctions orders do not address "claims." *See, e.g.*, *H.E. Butt Groc. Co. v. Currier*, 885 S.W.2d 175, 177 (Tex. App.—Corpus Christi-Edinburgh 1994, no pet.) (holding appellant did not prove abuse of discretion in denial of severance because claim in case was negligence and claim for sanctions could not be maintained as separate suit as sanctions were so interwoven with negligence action, involving same facts and issues). Because there is authority supporting the trial court's denial of severance, we conclude that relators have not established that the trial court abused its discretion.

**B.    Sanctions and Disqualification Order**

Relators next argue that the trial court abused its discretion in disqualifying them and imposing sanctions because (1) no evidence supports the trial court's finding of bad faith and (2) the sanctions were unjust and excessive. Real parties in interest assert that all of relators' issues concern factual findings by the trial court that are not reviewable mandamus.

## 1. Bad Faith

"Trial courts have inherent power to sanction 'to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts.'" *Sprague v. Sprague*, 363 S.W.3d 788, 803 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (internal quotations omitted). Core functions include "hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment and enforcing that judgment." *Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi-Edinburgh 1992, no writ).

"Bad faith is not just intentional conduct but [the] intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts." *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 718–19 (Tex. 2020). Bad faith "includes 'conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose.'" *Id.* at 719 (internal citation omitted); *see also Zuehl Land Dev., LLC v. Zuehl Airport Flying Cmty. Owners Ass'n, Inc.*, 510 S.W.3d 41, 54 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Inherent power exists only to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as significant interference with the traditional core functions of Texas courts."). Bad faith may be shown by circumstantial evidence, including reasonable inferences drawn from evidence concerning intent. *See Brewer*, 601 S.W.3d at 719.

11

Bates asserts that relators' arguments turn on disputed fact issues that cannot be resolved by mandamus. *See In re Republic Lloyds*, 104 S.W.3d 354, 357 ((Tex. App.—Houston [14th Dist.] 2003, orig. proceeding); *see also In re B.B.*, 632 S.W.3d 136, 139 (Tex. App.—El Paso 2021, orig. proceeding). In *In re B.B.*, the court stated that if a legal question turns on disputed questions of fact, mandamus should be denied because appellate courts may not resolve fact issues on mandamus. 632 S.W.3d at 139; *see also Shell Oil Co. v. Smith*, 814 S.W.2d 237, 241 (Tex. App.— Houston [14th Dist.] 1991, orig. proceeding) (holding court may not consider conflicting evidence and its relevance because appellate courts may not consider disputed fact issues in mandamus proceedings).

Relators specifically challenge three trial court findings: (1) relators knowingly facilitated transmission of privileged documents; (2) relators engaged in a quid pro quo by referring Harris to a family lawyer in exchange for her provision of privileged information; and (3) relators lied to the trial court to conceal and mischaracterize their conduct. Our review of the record reveals that the trial court's challenged findings are based on conflicting evidence and therefore, relators are not entitled to mandamus review.

### a. Knowingly facilitated transmission of privileged documents

Although relators assert that there is no evidence of knowing facilitation of transmission of privileged documents, there is evidence from which the trial court

could have reached its finding.  For instance, Crawford testified that he believed he had done nothing wrong because Harris came to him unsolicited, she already had the documents, and he did not ask her for particular documents.

But other evidence shows that Crawford reviewed Harris's screen shots of documents and other information, which revealed some communications between Bates and his attorneys, and that Crawford asked Harris to email the documents to him.  Thus, the trial court reasonably could have concluded from this evidence that relators knew that the information contained communications between Bates and his attorney including his attorney's law firm letterhead, and thus, were aware of possible attorney-client privilege.  Relators claimed the privilege had been waived because Harris had Bates's password, but Bates testified that he never gave Harris permission to look through his personal emails and social media and Harris agreed, in at least one affidavit and on the stand, that she did not have Bates's permission and that she had his password in case she needed to handle anything while Bates was working on the drilling rig without internet access.

Based on this conflicting evidence, the trial court could have concluded that relators were aware of the possible privileged nature of many of the documents and requested download of those documents by Harris (she already had screen shots of the documents).  The conflicting evidence and inferences requiring factual resolution

preclude us from resolving this factual dispute by mandamus. *See, e.g.*, *In re Republic Lloyds*, 104 S.W.3d at 357.

### b. Quid pro quo

There was also conflicting evidence over whether Harris received a quid pro quo in exchange for the information she provided to relators. Relators challenge the trial court's finding of a quid pro quo, first asserting that there was no evidence that they engaged in "witness tampering," which the trial court found. In their petition, relators recite the elements of the criminal offense of witness tampering and assert that the trial court did not find that Harris conditioned her testimony on benefits she expected to receive or that relators asked her to lie.

According to relators, there was no proof that Harris's disclosure of privileged or confidential information was conditional upon receiving any benefit. Although the record does not show that Harris relied on an express promise of a benefit when she first contacted Crawford and transferred Bates's information to Crawford, she told Crawford she had recently broken up with Bates and claimed the information she possessed would reveal that Bates's injury claims were fraudulent

Harris testified that, after transferring information to Crawford in August 2022, relators helped her hire an attorney to assist her with her child support issues. In particular, Harris testified that a Lugenbuhl firm employee, Yoran, whom Harris thought was Crawford's assistant, but who was actually a paralegal, told Harris that

they had been trying to reach her to see if she needed help with her child support issues. When Harris responded that she was going to the child support office that day, Yoran told Harris that Crawford knew an attorney in the same building who could assist her and Harris made an appointment. Harris ultimately retained the family attorney to whom she was referred. The trial court also heard evidence that Harris did not pay for the family lawyer and that after Harris retained the attorney, she provided more documents and information to the Lugenbuhl firm.

Crawford testified that the Lugenbuhl firm referred Harris to an attorney for the purpose of potentially obtaining a protective order for her safety. Harris had stated in her December 27, 2022 affidavit that Bates was angry with her for sharing emails and other information with Transocean's attorneys, but on the stand Harris recanted that and said that Bates had never threatened her. Harris stated that Bates had come to her house and rang the doorbell multiple times, but that was to try to pick up the children on a weekend that was not his weekend to have possession of them. Harris testified that she never felt unsafe. Crawford testified that neither he nor Lugenbuhl firm paid for Harris's family lawyer's fees; rather, it was Transocean that had paid for these services, but Crawford did make the referral. Crawford admitted that no protective order was filed.

We note that there is thus some evidence in the record from which the trial court could have found that Harris understood that, after she provided Bates's

15

privileged and confidential information, Transocean would help her cover the fees of her family lawyer. Harris stated in one affidavit that she was not referred to the family lawyer for a protective order, only for child support or custody issues. Harris attached to her affidavit a copy of her contract with the family attorney, where she stated that he was employed to represent her in a paternity/custody matter only. Because there is conflicting evidence in the record concerning a potential quid pro quo, we conclude that we may not grant mandamus. *See, e.g., In re Republic Lloyds*, 104 S.W.3d at 357.

### c. Lying to the court

As stated previously, Crawford testified that he referred Harris to a family lawyer because he was concerned for Harris's safety and thought she might need a protective order. The record shows that Harris never expressed fear of Bates. But Harris did testify that Bates engaged in threatening behavior by showing up at her home and ringing the doorbell about 80 times. However, she testified that this did not concern the documents and information she shared with Crawford or the Lugenbuhl firm but related to Bates's mistaken understanding that he was entitled to possession of the children on a weekend he did not have possession. Given this conflicting evidence, we cannot conclude that the trial court could have reached only one decision. And given that conflicting evidence both supports and conflicts with the trial court's ruling, mandamus is not appropriate. *See, e.g., In re Republic Lloyds*,

104 S.W.3d at 357; *In re B.R.H.*, 426 S.W.3d 163, 168 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding).

### 2. Whether sanctions were excessive and unjust

Relators next argue that this Court should grant them mandamus relief because the sanctions imposed against them were unjust and excessive as there was no proof that relators committed misconduct, the trial court did not make findings as to how relators' receipt of the information from Harris prejudiced Bates in the underlying proceeding, the sanctions bore no direct relationship to the Bates litigation, and the sanctions imposed against "any Lugenbuhl lawyers admitted to practice before th[e] Court" did not target the true offender.

The Texas Supreme Court has held that imposition of sanctions is measured by two standards: (1) "a direct relationship must exist between the offensive conduct and the sanction imposed;" and (2) the "sanctions must not be excessive." *TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). To satisfy the first prong, "a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party." *Id.* The trial court must also determine if the sanctionable conduct is attributable to counsel, the party, or both. *See id.*

The second prong requires the sanction to be "no more severe than necessary to satisfy its legitimate purposes." *Id.* Thus, "courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote

17

compliance." *Id.* The imposition of severe sanctions, such as striking a party's pleadings or dismissing its action, is limited by constitutional due process. *See id.* at 917–18. Thus, "[d]iscovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Id.*

"Disqualification is a severe remedy" that can cause "immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the right to have counsel of choice." *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002). "In considering a motion to disqualify, the trial court must strictly adhere to an exacting standard to discourage a party from using the motion as a dilatory trial tactic." *Id.* Although the Texas Supreme Court often looks to the disciplinary rules in deciding disqualification issues, the disciplinary rules are merely guidelines and "[e]ven if a lawyer violates a disciplinary rule, the party requesting disqualification must demonstrate that the opposing lawyer's conduct caused actual prejudice that requires disqualification." *Id.* A trial court also has the power, under appropriate circumstances, to disqualify an attorney who has not violated a disciplinary rule. *See id.*

Although proof of a disciplinary rule violation is not necessary for an attorney to be disqualified, "[a] trial court can abuse its discretion by not disqualifying an attorney who violates the disciplinary rules of professional conduct." *Hornsby v.*

18

*Tarrant Cnty. Coll. Dist.*, No. 02-11-00445-CV, 2013 WL 2093155, at *6 (Tex. App.—Fort Worth May 16, 2013, pet. denied) (mem. op.). "When an attorney's conduct gives the strong appearance of impropriety, casting doubt upon the integrity of the legal profession, the court should act to guard that integrity." *Id.* at *7.

The trial court found that sanctions were proper and awarded them under several Texas Disciplinary Rules of Professional Conduct. First, the trial court cited to rule 4.04(a), which provides that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such person." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.04(a), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A-1. There is evidence in the record from which the trial court could have concluded that relators assisted Harris in the transfer of Bates's privileged and confidential information that allegedly showed his suit against Transocean was fraudulent and relators did not disclose to Bates that they had this information for almost sixty days.

The trial court also referenced rule 8.04(a)(1), which states: "A lawyer shall not . . . violate these rules, knowingly assist or induce another to do so, or do so through the acts of another whether or not such violation occurred in the course of a client-lawyer relationship." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.04(a)(1). Although relators did not have a "client-lawyer" relationship with Harris

19

or Bates, there is evidence in the record from which the trial court could have concluded that they assisted in the transfer of privileged documents without Bates's knowledge.

Finally, the trial court cited to rule 8.04(a)(3), which prohibits a lawyer from engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation." *Id.* at TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 8.04(a)(3). As discussed previously, there was conflicting evidence from which the trial court could have concluded that relators knowingly assisted Harris in the transfer of confidential and privileged information without immediately disclosing this to Bates or his counsel and that they offered legal assistance to Harris and paid her fees which could be viewed as a quid pro quo for the transfer of such information. Because there was conflicting evidence on these matters, we cannot conclude the trial court could have reached only one decision and thus, mandamus is not proper. *See, e.g., In re Republic Lloyds*, 104 S.W.3d at 357.

In addition to challenging whether there was proof that they knew the material was privileged, relators assert that the sanctions were unjust because there was no proof of prejudice to Bates and even if Bates was prejudiced, the sanctions imposed were improper because case law provides that the proper remedy for obtaining the opposing party's privileged or confidential information is to return the information to the opposing party. Citing *In re Meador*, 968 S.W.2d 346 (Tex. 1998), relators

state that they returned the documents to Bates. But *In re Meador* does not merely discuss returning privileged documents and there was no alleged wrongdoing by counsel in that case.

In *In re Meador*, an executive assistant to the president of a company had access to the president's office and copied documents. *See* 968 S.W.2d at 348. She alleged that another employee at the company had sexually harassed her, and she filed suit and gave her attorney copies of the documents. *See id.* at 349. Months later, documents were produced, and the company moved to disqualify the executive assistant's counsel and demanded return of the documents, asserting that they were privileged. *See id.* After a hearing, the trial court ordered the executive assistant's counsel to return the documents but refused to disqualify him. *See id.* The defendants filed a petition for writ of mandamus, asserting an abuse of discretion in the denial of their motion to disqualify the executive assistant's attorney. *See id.* The Texas Supreme Court acknowledged that some situations did call for a party's attorney to be disqualified and a trial court must consider the importance of discovery privileges along with all the facts and circumstances to decide whether the interests of justice require disqualification. *See id.* at 351. [3]

---

[3] In *In re Meador*, the Texas Supreme Court quoted an opinion from the American Bar Association's Committee on Ethics and Professional Responsibility:

> A lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon receiving the privileged or confidential nature of the materials,

The Texas Supreme Court set out six factors to be considered "when a lawyer receives an opponent's privileged materials outside the normal course of discovery." *Id.* at 351–52. A court must consider:

(1) whether the attorney knew or should have known that the material was privileged;

(2) the promptness with which the attorney notifies the opposing side that he or she has received its privileged information;

(3) the extent to which the attorney reviews and digests the privileged information;

(4) the significance of the privileged information; i.e., the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice;

(5) the extent to which movant may be at fault for the unauthorized disclosure; and

(6) the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney.

*Id.* at 351–52. The Court observed that an attorney who "uses privileged information improperly obtained from an opponent potentially subverts the litigation process,"

---

either refrain from reviewing such materials or review them only to the extent required to determine how appropriately to proceed; she should notify her adversary's lawyer that she has such materials and should either follow instructions of the adversary's lawyer with respect to the disposition of the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.

*In re Meador*, 968 S.W.2d 346, 349 (Tex. 1998) (orig. proceeding) (citing ABA FORMAL OP. 94-382, no longer available on ABA website).

22

but because the supreme court found that some factors supported disqualification and some did not, the Court concluded the trial court had not abused its discretion in denying disqualification. *See id.* at 351. In particular, there was no showing that the information would prejudice the executive assistant's claims or that her attorney was involved in obtaining the information, but there was a showing that she would suffer serious hardship if her attorney were disqualified. *See id.* at 352. Although relators suggest that the supreme court in *In re Meador* held that return of the documents was the appropriate remedy, the court simply acknowledged that they presumed executive assistant's counsel had returned the documents as ordered by the trial court. *See id.* at 352. The supreme court instead found that the six factors did not mandate disqualification under the circumstances of the case but noted that a different case would be presented if the "attorney [was] directly involved in improperly obtaining the other side's confidential information." *Id.* at 354.

Bates relied on *In re Meador* in his motion to disqualify and for sanctions, and urged a finding that all of the *In re Meador* factors supported disqualification. Although the trial court did not name the In re *Meador* case in its order, the factors were considered in the order. The trial court found that relators knew the material was privileged, that they did not return the material promptly but held onto it for two months, that Bates was prejudiced by the taking of the privileged documents, and that Bates was not at fault for the unauthorized disclosure. The trial court also noted

23

that Transocean would not suffer prejudice from the disqualification of relators because it was represented by other counsel.

In this mandamus proceeding, relators have challenged the first *In re Meador* finding, namely that they knew the material was privileged, but as we have explained, there is conflicting evidence on this point, and we cannot conclude that the trial court could have reached only one decision.

Relators also challenge the trial court's finding that Bates suffered prejudice. As for prejudice to Bates, the trial court found that by obtaining the confidential and privileged information relators obtained an unfair advantage and that if Bates had not learned of the disclosure of the confidential and privileged documents, the prejudice to him would have been even greater. When Harris initially contacted Transocean in August 2022, and was directed to Crawford, she asserted that she had information suggesting that Bates's suit against Transocean was fraudulent because he was not injured and she ultimately provided information concerning Bates, including, among other things, communications with his counsel and his litigation funding agreement. This evidence supports an inference that the material Harris provided was harmful to Bates's case. The trial court also found that Bates's legal team had expended considerable time in countering the misconduct by relators. Although relators denied any misconduct and claimed that Bates suffered no prejudice because the documents and information was eventually returned, the trial

24

court resolved conflicting evidence concerning relators' conduct and the prejudice to Bates. We may not review the findings based on conflicting evidence in a mandamus proceeding. *See, e.g., In re Republic Lloyds*, 104 S.W.3d at 357.

Relators further assert that once they returned the documents, their future conduct posed no risk of prejudice to Bates's case. Relators also state that there was no future prejudice to Bates because the Lugenbuhl firm attorneys exited the case. The record shows that a motion to withdraw was filed by the Lugenbuhl attorneys Crawford and Delos Flint. Nothing else in the record shows that other Lugenbuhl firm attorneys moved to withdraw. Soon thereafter, the trial court signed its February 2, 2023 order disqualifying Crawford and on the same date, it granted Flint's motion to withdraw. Thus, the remaining Lugenbuhl firm attorneys involved in the case did not exit but their pro hac vice status was later revoked by the trial court's December 28, 2024 order.

In any event, the reasons for imposing sanctions did not only concern prejudice to Bates; they also concerned relators' conduct in the trial court and what the trial court perceived to be a lack of remorse and failure to admit any misconduct. Based on the evidence before the court, the trial court found that relators' conduct was "egregious behavior defiling the very temple of justice." Based on these findings and the evidence below, the trial court had the discretion to impose sanctions, such as disqualification and monetary sanctions, under the facts of this

25

case. *See Cire v. Cummings*, 134 S.W.3d 835, 842 (Tex. 2004). The question before this Court is not whether in our opinion the facts present an appropriate case for the trial court's action, but rather "whether the court acted without reference to any guiding rules and principles." *Id.* at 839. On this record, we cannot conclude the trial court's ruling was arbitrary or unreasonable.

Turning to the $500,000 monetary sanction, relators not only assert that it is excessive, but also that it is unsupported by evidence of attorney's fees incurred. Relators contend that the monetary sanction is disproportionate to the alleged misconduct and that there was no proof of fees incurred.

Monetary sanctions are reviewable on appeal and are only subject to mandamus review if the party challenging the sanction "shows that the sanctions would totally or significantly preclude its further access to the court." *Tjernagel v. Roberts*, 928 S.W.2d 297, 303 (Tex. App.—Amarillo 1996, orig. proceeding). In its order, the trial court found that "requiring payment of sanctions in the time provided by th[e] [o]rder w[ould] not impair . . . Crawford, the Lugenbuhl firm, or Transocean's access to, or willingness to access, the courts." Because relators do not challenge this finding or otherwise contend that sanctions would preclude their access to the court, they have an adequate remedy by appeal and mandamus is not proper. *Id.* (concluding that because relators did "not contend that the imposition of the award of attorney's fees against them would preclude their access to the court,

26

and obviously it did not, they have an adequate remedy by normal appeal, from a final judgment, and mandamus is not proper." *Id.* at 303 (internal citations omitted).[4]

We turn next to the disclosure sanction, which provides:

> IT IS, THEREFORE, ORDERED that the Lugenbuhl lawyers who are subject to this order are required to disclose a copy of this order to any other Texas court to which they submit an application for admission pro hac vice for the next ten years. Having defiled the Texas courts, the Lugenbuhl lawyers should not be permitted to appear in any Texas court without a copy of this Order to any Court considering their application of this history of misconduct.

Aside from their argument that this portion of the order constitutes an excessive sanction, relators also claim it is void for vagueness because it uses the phrase, "Lugenbuhl lawyers who are subject to this order."

Relators argue that requiring them to attach a copy of the sanctions order to future pro hac vice applications is unconstitutionally vague because it fails to give fair notice of what conduct must be punished and it invites arbitrary enforcement. *See Comm'n for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). An order must be "clear, specific, and unambiguous" to be enforceable by contempt, but that does not mean that orders which are less than clear and unambiguous are invalid. *See In re J.J.R.S.*, 627 S.W.3d 211, 223 (Tex. 2021).

---

[4] We further note that, as real parties in interest note, the sanctions do not pose imminent harm because the trial court vacated the thirty-day deadline in the sanctions order.

This portion of the trial court's order states that the Lugenbuhl lawyers "who are subject to this order" must disclose a copy of the trial court's sanctions order when they submit an application for admission pro hac vice to a Texas court for the next ten years. Relators argue that this sanction is vague because it is unclear which Lugenbuhl lawyers are "subject to this order." Relator observe that in one part of the order the trial court mentions Lugenbuhl lawyers working on the case, and in other parts refers to the Lugenbuhl firm and the Lugenbuhl lawyers admitted to practice in the Bates trial court. Bates disagrees and asserts that the order clearly relates only to the Lugenbuhl lawyers who worked on the Bates case in the Texas MDL.

In much of the fact findings in the order, the trial court refers to the "Lugenbuhl firm," but when it assesses sanctions it specifically revokes the pro hac vice status of the Lugenbuhl lawyers admitted to practice in the Bates case and orders these same Lugenbuhl lawyers referred to the appropriate disciplinary authorities. Thus, when it orders the Lugenbuhl lawyers to disclose a copy of the sanctions order when they apply for admission pro hac vice for ten years in the future, it refers to the same Lugenbuhl lawyers subject to this order—the Lugenbuhl lawyers admitted pro hac vice in the Hurricane Zeta MDL who worked on the Bates case. Thus, we do not find that the trial court's description of which lawyers are subject to the disclosure sanction to be void for vagueness.

28

Relators next assert that this sanction, as well as the other non-monetary sanctions, such as revoking their pro hac vice status and requiring referral to disciplinary authorities in Texas and Louisiana harm the attorneys' reputations and hamper their business. Relators compare these sanctions to death penalty sanctions, even stating that these sanctions "far exceed" death penalty sanctions. But death penalty sanctions are imposed against parties and no party is implicated in the non-monetary sanctions.

We need not reach the issue of whether the disclosure sanction fails to give fair notice of what conduct must be punished because we conclude this sanction is excessive, not for the requirement of disclosure of the order, but for the term of punishment. To justify imposition of sanctions, there must be a direct relationship between the misconduct and the sanction imposed and the sanction must not be excessive. *See Cire*, 134 S.W.3d at 839. Less stringent sanctions must be considered if lesser sanctions would fully promote compliance. *See id.* Although the trial court intended this sanction to inform future trial courts of the misconduct sanctioned in this case, requiring every Lugenbuhl lawyer who worked on the Bates case to provide future Texas courts with a copy of the order for the next ten years is an excessively long period of time to extend the punishment for these attorneys who were not specifically identified, to whom misconduct was imputed, and for whom lesser sanctions were not considered.

Finally, relators assert that there was no evidence that relators' conduct interfered with the trial court's legitimate exercise of its core functions. Because the trial court has the power to sanction when necessary to deter and alleviate "bad faith abuse of the judicial process," including "any significant interference with the courts' core functions," there must be "some evidence and factual findings of the conduct" that significantly interfered with the exercise of those core functions. *Island Ent., Inc. v. Castaneda*, 882 S.W.2d 2, 5 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (quoting *Kutch*, 831 S.W.2d at 510).

Making false statements or lying to the court is an example of subversion of the integrity of the judicial process. *See Kazi v. Sohail*, No. 05-21-00432-CV, 2022 WL 202959, at *6 (Tex. App.—Dallas Jan. 24, 2022, pet. denied) (quoting *Young v. Office of the U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 71 (D.D.C. 2003), which states "Lying cannot be condoned in any formal proceeding . . . . Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts."(alteration in original)). As previously discussed, there is conflicting evidence over whether Crawford lied to the trial court when he testified that he was worried about Harris's safety and referred her to the family lawyer for possible filing of a protective order, and we may not review conflicting fact disputes that the trial court resolved in a mandamus proceeding. *See In re B.R.H.*, 426 S.W.3d at 168 (weighing conflicting evidence is trial court function, not appellate court function).

False statements to the trial court have been held to justify discovery sanctions under a trial court's inherent power but not to justify death penalty sanctions unless the conduct justifies a presumption that the party's claims or defenses lack merit. *See In re Estate of Perez-Muzza*, 446 S.W.3d 415, 425 (Tex. App.—San Antonio 2014, pet. denied). Although relators assert that the sanctions against the Lugenbuhl lawyers are equivalent to death penalty sanctions, this is not established. Death penalty sanctions would have involved adjudicating Transocean's counterclaims and defenses but that did not occur. *See In re Hood*, 113 S.W.3d 525, 529 (Tex. App.—Houston [1st Dist.] 2003, orig. proceeding) (stating that death penalty sanctions have effect of precluding decision on the merits of party's claim such as striking pleadings). Accordingly, we hold that relators have not established entitlement to mandamus relief concerning disqualification or the imposition of sanctions other than the disclosure sanction.

## C. Adequate Remedy

Relators assert that they lack an adequate remedy by appeal of the order denying their motion for severance and the orders disqualifying and imposing monetary and other sanctions against them. Turning first to the denial of severance, while an order denying severance is not a final appealable judgment and therefore, mandamus is appropriate to challenge that order, we have already concluded the trial court did not abuse its discretion in denying the motion to sever. *See In re Reynolds*,

31

369 S.W.3d 638, 646 (Tex. App.—Tyler 2012, orig. proceeding). As for the disqualification order, case law holds that there is no adequate remedy by appeal. *See In re Cerberus Cap. Mgmt., L.P.*, 164 S.W.3d 379, 383 (Tex. 2005). Thus, we conclude that relators lack an adequate remedy by appeal as to that portion of the mandamus proceeding.

## Conclusion

We deny relator's petition as to all issues other than their complaint concerning the portion of the trial court's order requiring the "Lugenbuhl lawyers" subject to the order to disclose a copy of the order whenever they apply for admission pro hac vice for the next 10 years. As to this disclosure portion of the order, we conditionally grant the petition and order the trial court to vacate that portion of the order. We are confident the trial court will do so. The writ will issue only if the trial court does not.

.                                                        Kristin M. Guiney
                                                            Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.